IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 12, 2005 Session

## KERRY HIBDON v. GEORGE J. GRABOWSKI, ET AL.

**A Direct Appeal from the Circuit Court for Warren County**
**No. 904     The Honorable John H. Turnbull, Judge**

---

**No. M2004-01050-COA-R3-CV - Filed September 27, 2005**

---

Plaintiff/Appellant owner of jet ski customizing business brought defamation action against defendants alleging libel, civil conspiracy and false light invasion of privacy stemming from statements defendants made about plaintiff, which were published on an Internet news group. The trial court held that venue was proper in Warren County, Tennessee, and that the court had jurisdiction over out-of-state resident defendants. Finding that plaintiff was a public figure for purposes of libel action, that plaintiff could not prove actual malice, and that plaintiff failed to show actual damage, the trial court granted summary judgment in favor of the defendants. Plaintiff appeals. We affirm in part, reverse in part, and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

August C. Winter of Brentwood, Tennessee for Appellant, Kerry Hibdon

Henry D. Fincher of Cookeville, Tennessee for Appellees, George J. Grabowski, Ind. & d/b/a HPT Sport USa, Fagan pace, Ind. 7 d/b/a Pace Tech, Ben Pennington, Ronnie Reels and Larry Talley

**OPINION**

Kerry Hibdon ("Hibdon," "Plaintiff," or "Appellant") operates a television repair business in McMinville, Tennessee. An interest in riding jet skis, and in modifying jet skis to increase their speed, led Hibdon to start a jet ski customizing business called The Jet Shop. This business was also

located in McMinville.  Hibdon advertised his jet ski business on the Internet. He also published descriptions of the speeds his customized jet skis were achieving on the Internet news group <u>rec.sport.jetski</u>.[1]  In July of 2000, *SPLASH Magazine*, a periodical for jet ski enthusiasts, published an article reporting that two of Hibdon's jet skis had been tested and that the results substantiated Hibdon's claims that his modified jet skis were capable of reaching speeds of over seventy miles per hour.  The *SPLASH* article authored by Jeff Ames reads:

> Kerry and April Hibdon have what appears to be matching Kawasaki Ultra 150 watercraft.  We found Hibdon boasting about his Ultra 150 reaching a top speed of 74.2 mph in the rec.sport.jetski Internet news group.  To make it a little more enticing Hibdon also claimed that his wife April's Ultra radared in at 71.5 mph.  He also went on to make the claim that both of these watercraft run on pump gasoline.  After hearing these claims it was easy to choose the Hibdons as SPLASH Magazine's first victims of the "Net Patrol".  We set a date for testing and prepared to put the Ultras to the test.

> Unfortunately Mother Nature didn't cooperate with us as easily as the Hibdons.

> A storm system moved through the area which dropped the temperature almost fifty degrees in a 24-hour period.  Instead of 70 to 75 degrees it was now 20 degrees.  Since deadlines do not pay attention to weather reports, we could only postpone our testing until the following day.  This day turned out a little warmer (low 40's) and not quite as windy as the previous day. Unfortunately, we still had winds in the vicinity of about 8-10 mph, making the water a little choppy.  Not an ideal scenario for top speed and acceleration testing, but like a trooper Hibdon went on with the test.  For top speed passes at the radar gun Kerry's Ultra 150 topped out at 72.3 mph a little less than the 74.2 mph that he had claimed on the news group.  April's Ultra 150 had a top speed of 71.0 mph [,] .5 short to the claim in the news group.

> There is no question in our minds that the speeds that were listed in the news group are factual numbers on these watercraft.  The conditions we were faced to test in were not ideal and [conducive] to a good top end speed.  The overall acceleration of both craft was very impressive even in the choppy water.  Kerry's Ultra accelerated 0-60 in 4.61 seconds, April[']s 5.24 seconds.  Both Ultras have stock milled heads, prototype V-Force Delta II reeds, porting, resistor for timing set, re-pitched impeller

---

[1] An Internet-supported news group is simply "a computerized version of a cork and pin board on which users can post, read, and respond to messages." Jeremy Stone Weber, *Defining Cyberlibel: A first Amendment Limit for Libel Suits Against Individuals Arising from Computer Bulletin Board Speech* (1995) 46 Case Western Reserve L.Rev. 235, 238.  Through the Internet, millions of users can communicate through bulletin boards, which are arranged by subjects in a system known as "news groups." *Id.*  These news groups are topical collections of messages submitted by Internet users. *Id.*  By late 1993, over 120,000 news groups existed, representing more than 4.2 million participants. *Id.*  Once a person is logged on to an Internet news group, the person may post original messages, respond to messages already posted, or simply read the discussions without posting any of his or her own messages. *Id.* at p. 239.  Most such systems allow users to participate using pseudonyms if they choose to do so. *Id.* at p. 241.

and Worx Sponsors. The Pumps on both Ultras have been removed and had all the rough edges smoothed as well as had the intake grate and pump shoe sealed. Kerry also reworked the front splash guard on each to keep the nose of the watercraft from diving in rough chop. About the only difference between the two Ultras is that Kerry's has a set of Buck Shot Carbs and a more aggressive port job. The combination between the two is what gives Kerry's Ultra the acceleration edge and top speed power.

The Jet Shop is Kerry's watercraft business. He is in the process of developing a Big Bore kit, Triple Pipes and impellers for the Kawasaki Ultra. The Hibdons, including son Michael, enjoy their Ultra 150 watercraft for fun and a little friendly side by side racing with the rest of their watercraft friends. It was a pleasure for the Net Patrol to somewhat validate the claims Kerry had made in the news group. For more information on how you can have your watercraft appear on these fine pages, make a posting on the news group about what you've got. If we[']re interested, we'll be contacting you.

A "Source Box" appeared below the article providing the name of Hibdon's business, along with mailing address, phone number and e-mail address.

In March of 2001, *SPLASH Magazine* published another article reporting that Hibdon had modified a jet ski that successfully reached the speed of eighty miles per hour. This article was highlighted on the magazine's cover with a photo of Hibdon. Hibdon was mentioned two additional times in *SPLASH* editorials. Following the publication of the articles in *SPLASH*, the Defendants (also jet ski enthusiasts) published numerous remarks on rec.sport.jetski. Many of these remarks were critical of Hibdon's jet ski modifications and questioned the authenticity of the speed Hibdon's modified jet skis had achieved. The Defendants also criticized Hibdon's skills as a jet ski mechanic, and made negative personal comments about Hibdon. Additionally, Defendant Grabowski, who operates a competing jet ski customizing business in Paducah, Kentucky, HPT Sports USA, published statements about Hibdon on Grabowski's business website under a category called "Chop Shop."

On June 21, 2001, Kerry Hibdon filed a Complaint against George J. Grabowski, HPT Sport USA, Fagan Pace, Pace Tech, Ben Pennington, Ronnie Reels, Larry Talley, David Haynes and James Mehaffey (together the "Defendants") for libel and civil conspiracy.[2] The substance of the Complaint centered on statements published in 2000 and 2001 by the Defendants on the news group rec.sport.jetski, as well as on Defendant Grabowski's business website. Hibdon alleged that these remarks were defamatory and negatively affected his jet ski business. Hibdon claimed that the comments resulted in economic loss and caused him emotional distress. Hibdon further alleged that Defendant Grabowski offered low or no cost jet ski modification work to Defendants Talley, Haynes and Mehaffey, in exchange for those Defendants publishing comments on the rec.sport.jetski site, which were favorable to Grabowski and critical of Hibdon. On September 11,

---

[2] Defendants David Haynes and James Mehaffey are not included as appellees on appeal.

2002, Hibdon amended his Complaint to seek damages for libels that were published after the filing of the Complaint. The Amended Complaint also asserts an additional claim for false light invasion of privacy.[3]

Between August 9, 2001 and November 5, 2001, Defendants Grabowski, Pace Reels, Talley and Pennington filed Rule 12.02 motions to dismiss asserting that venue in Warren County was improper. In addition, the non-resident Defendants Grabowski and Pace asserted that they were not subject to personal jurisdiction in the state of Tennessee. Defendants Grabowski, Pennington and Reels also asserted that the Complaint failed to state a claim upon which relief could be granted and moved for dismissal pursuant to Rule 12.02(6). On September 10, 2002, the trial court entered an Order denying Defendants' motions to dismiss, which reads, in pertinent part, as follows:

> This cause came before the Court on August 29, 2002, for hearing of the Rule 12.02 motions to dismiss filed on behalf of the defendants Grabowski, Pace, Pennington, Reels and Talley. All of these defendants moved for dismissal on the asserted ground that venue in Warren County was improper. In addition, the non-resident defendants Grabowski and Pace asserted that they were not subject to the personal jurisdiction of this State. The defendants Grabowski, Pennington and Reels also asserted that the complaint failed to state claims against them upon which relief could be granted, and moved for dismissal pursuant to Rule 12.02(6).
>
> After consideration of the record in this cause, including the affidavits filed in support of and in opposition to these motions, and after considering the oral and written argument of counsel, the Court finds that these motions are not well-taken and are in all respects DENIED. Pursuant to Rule 12.02(6), and at the request of counsel for the defendants Grabowski, Pennington and Reels, the Court also will treat the motions of these defendants as Rule 56 motions for summary judgment. The Court further finds that the Rule 56 motions for summary judgment of the defendants Grabowski, Pennington and Reels are not well-taken and are in all respects DENIED.

On January 14, 2003, Defendants Grabowski, Pace, Pennington, Reels and Talley filed an Answer and Counterclaim that denied the material allegations of the Complaint and asserted a separate counterclaim by Defendants Reels, Pennington and Talley for breach of contract and breach of warranty based upon Hibdon's allegedly deficient work performed on the Defendants' jet skis.

In addition to the affirmative defense of unclean hands, Defendants also assert a lack of liability based upon the alternative arguments that the statements are truthful, that the statements are merely opinion, or that the statements are protected by the First Amendment and the Tennessee Constitution's guarantee of freedom of speech. Additionally, the Defendants reassert that venue was

---

[3]

Neither Hibdon's claim of false light invasion of privacy, nor his claim of civil conspiracy have been raised on appeal. Consequently, these issues are waived.

not proper in Warren County and that the court lacked personal jurisdiction over Defendants Grabowski and Pace.

On July 31, 2003, Defendants Grabowski, Pace, Pennington, Reels and Talley filed a Motion for Summary Judgment along with a Statement of Undisputed Material Facts, depositions, and affidavits in support thereof. In these documents, the Defendants assert that Hibdon is a public figure and that he is unable to prove that the Defendants' statements were made with actual malice or with reckless disregard for their truth as required under Tennessee law. The Motion for Summary Judgment further argues that Hibdon was unable to prove the element of actual damages stemming from the alleged defamation as required under Tennessee law. On November 12, 2003, Hibdon filed "Plaintiff's Memorandum in Opposition to Motion for Summary Judgment," along with "Plaintiff's Responses to Defendants' Statement of Material and Undisputed Facts," and Affidavits in support thereof. In these documents, Hibdon argued that this is not a public controversy, and that he is not a public figure for purposes of this libel action. In the alternative, Hibdon asserts that, if he is found to be a public figure, then there was sufficient evidence to support a finding, by clear and convincing evidence, that not only the Defendants acted with actual malice but also that Hibdon suffered actual injury and damages. Finally, Hibdon argues that the Defendants relied upon a deposition given by Hibdon in a previous case, which involved a different set of defendants and concerned an entirely different set of libelous publications. Hibdon argues that the testimony given in that deposition is misleading and not relevant in the present case.

On December 19, 2003, the trial court entered an Order granting Defendants' Motion for Summary Judgment. The Order reads, in pertinent part, as follows:

> This cause having come to be heard on the 5th day of December, 2003, on the Motion for Summary Judgment filed by Defendants Reels, Grabowski, Pennington, Pace and Talley, and the Court having reviewed all the filings of the parties and considered the arguments of counsel, the Court finds and decrees as follows:
>
> 1. The Plaintiff is a limited purpose public figure and required to show that the Defendants acted with actual malice.
>
> 2. The Plaintiff does not have material evidence of actual malice that would prevent the entry of summary judgment in this case.
>
> 3. The Plaintiff does not have material evidence that his claimed damages were caused by the Defendant's allegedly defamatory publications as distinguished from their non-defamatory publications that would prevent the entry of summary judgment in this case.[4]

---

4

The trial court further ordered, pursuant to Tenn. R. Civ. P. 54.02, that the order operated as a final judgment
(continued...)

Mr. Hibdon appeals from the grant of summary judgment and raises three issues for review as stated in his brief:

> 1. Whether the trial court erred in holding that the Plaintiff, who advertised his jet ski business on the Internet, was a limited purpose public figure and required to show actual malice on the part of the Defendants in this libel case when:
>
> > (A) the Defendants failed to establish that the Plaintiff participated in a public controversy; and,
> >
> > (B) the defamatory statements published by the Defendants concerned the Defendants' private disagreements with the Plaintiff.
>
> 2. Whether, in light of the affidavits presented on behalf of the Plaintiff, the trial court erred in finding that the Plaintiff had failed to produce sufficient evidence that the Defendants had acted with actual malice.
>
> 3. Whether the trial court erred in holding, *sua sponte*, that the Plaintiff's case should be dismissed on summary judgment because the Plaintiff did not have material evidence that his damages were caused by the Defendants' alleged defamatory statements as opposed to their non-defamatory statements.

Appellees present twelve issues for review; however, we perceive their dispositive issues to be whether the trial court should have dismissed the Plaintiff's Complaint for improper venue, and/or whether the trial court should have dismissed the Plaintiff's complaint against non-resident Defendants Grabowski and Pace for lack of personal jurisdiction. We will discuss Appellees' issues following our discussion of Mr. Hibdon's specific issues surrounding the trial court's grant of Summary Judgment.

It is well settled in Tennessee that a motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* In *Byrd v. Hall,* 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

---

[4](...continued)

with regard to all of Plaintiff's claims against all Defendants. On January 20, 2004, Hibdon filed a Motion to Alter or Amend pursuant to Tenn. R. Civ. P. 59.04, which was denied by the trial court on April 14, 2004.

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain,* 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk,* 954 S.W.2d 722, 723 (Tenn. 1997).

The Tennessee Supreme Court has stated that the summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. *Evco Corp. v. Ross,* 528 S.W.2d 20, 24 (Tenn. 1975). Where a dispute does exist as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. *Id.* at 25. The trial court is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues. *Id.*

Libel and slander are both forms of defamation; libel being written defamation and slander being spoken defamation. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818, 820 (Tenn. 1994). To establish a *prima facie* case of defamation, the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.,* 995 S.W.2d 569, 571 (Tenn. 1999) (relying on Restatement (Second) of Torts § 580 B (1977)). If the plaintiff in a case of libel is a public official or public figure, they must also prove that the libelous statements were made with "'actual malice'- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct.710, 11 L.Ed.2d 41 (1988). The public figure must demonstrate evidence of actual malice with "convincing clarity." *Id*. at 285-86. However, the basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person. *Quality Auto Parts Co., Inc.,* 876 S.W.2d at 820.

The "actual malice" requirement does not apply to Mr. Hibdon unless it is first determined that Mr. Hibdon is a "public figure" within the meaning of *New York Times v. Sullivan. New York Times v. Sullivan, supra,* at 279-80. Tennessee has adopted the standards in § 580A and 580B of the Restatement (Second) of Torts (1977), which establish the distinction between defamation as to a public official or public figure and defamation of a private person. *Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn. 1978). As to a public figure, one can only be held liable if he or she knows that the statement is false and that it defames another person, or if he or she acts in reckless disregard of such

matters. *Id.* at 442. As to a private person, he or she may be held liable if he or she knows that the statement is false and that it defames the person, or if he or she acts in reckless disregard of these matters, or acts negligently in failing to ascertain them. *Id.* at 442.

In order to determine whether the trial court erred in granting summary judgment to the Defendants, this Court must first determine whether the trial court erred in finding that Mr. Hibdon is a public figure for purposes of the controversy that is the basis of this lawsuit. In determining the "public figure" status of Appellant, we are again guided by our Supreme Court in *Press, Inc.*:

> The term "public figure" includes . . . those who have thrust themselves into the vortex of important public controversies; those who achieve such pervasive fame or notoriety that they become public figures for all purposes, and in all contexts; those who voluntarily inject themselves, or are drawn into public controversies, and become public figures for a limited range of issues; and those who assume special prominence in the resolution of public questions.

*Press, Inc. v. Verran,* 569 S.W.2d at 441. More commonly, those classed by the courts as public figures have thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issues involved, inviting attention and comment. *Trigg v. The Elk Valley Times*, 720 S.W.2d 69, 72 (Tenn. Ct. App., 1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 798). In *Cloyd v. Press, Inc.,* 629 S.W.2d 24 (Tenn. Ct. App. 1981), the court, in reaching a determination of whether plaintiff was a public figure, stated:

> [D]oes a public controversy exist, and what is the nature and extent of the individual's participation in that controversy. The nature and extent of the individual's participation is determined by looking to three factors: the extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication [in] order to counteract false statements, and the prominence of the role played in the public controversy.

*Id.* at 25-26 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. at 342.)

In the instant case, Hibdon entered into the jet ski business and voluntarily advertised on the news group rec.sport.jetski, an Internet site that is accessible worldwide. On the Internet news group, Hibdon claimed that his modified jet skis had reached record-setting speeds of more than seventy-four miles per hour while running on regular pump gasoline. Hibdon claimed, on rec.sport.jetski, that he was "builder of some of the fastest jet skis on planet Earth." The significance of Hibdon's claims brought him to the attention of an editor at *SPLASH Magazine,* which was then a nationally circulated publication in the jet ski trade. Hibdon submitted to an interview and agreed to and have his modified jet skis tested by representatives of *SPLASH*. Again in 2001, Hibdon's jets ski modifications were featured in a *SPLASH* article promoting the quality of services Hibdon provided and the record-breaking speeds that his modified jet skis had achieved. The second time Hibdon was featured in *SPLASH*, he appeared on the cover of the magazine. Hibdon was mentioned two additional times in *SPLASH* editorials. Following the initial *SPLASH* article, Hibdon's jet ski modification business increased sharply. Hibdon received calls from potential customers both regional and from Canada and Guadeloupe. Shortly after the news of Hibdon's success with jet ski

modifications appeared in *SPLASH*, the Defendants began posting comments on rec.sport.jetski challenging Hibdon's success and the quality of his workmanship. In response, Hibdon himself posted many comments on rec.sport.jetski expressing his own opinions on the jet ski business, and countering comments made by the Defendants on the site. Hibdon admitted that the news group rec.sport.jetski was a public forum. Over 2,000 individual postings relating to this controversy appeared on the rec.sport.jetski. *SPLASH* published a positive editorial responding to the criticisms of Hibdon that appeared on rec.sport.jetski.

The first step in determining if a plaintiff is a public figure is to discern whether there is a public controversy. In his Opposition to the Motion for Summary Judgment, Hibdon argues that the controversy at hand does not rise to the level of a "public controversy," but is merely a private disagreement among the parties. A public controversy is defined as a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way. *See Waldbaum v. Fairchild Productions, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980). The United States Supreme Court stated that courts may not question the legitimacy of the public's concern on a particular issue because such an approach would run the danger of the turning the courts into censors of what information is relevant to self-government. *Gertz,* 418 U.S. at 346; *Waldbaum,* 627 F.2d at 1297. A vital part of free, wide-open, and robust public debate protected by the First Amendment to the United States Constitution is deciding what issues should be debated. No arm of the government, including the judiciary, should be able to set society's agenda for public debate, consequently, the courts look to see what matters were already in dispute prior to the time when the alleged defamatory statements were made. In determining whether there is a public controversy, it is vital to ascertain whether the dispute existed as a public concern prior to the alleged defamatory comments. *Id.; Quigley v. Rosenthal,* 43 F.Supp.2d 1163, 1176 (D. Col. 1999).

Here, the undisputed facts show that a public controversy developed over the purported success of Hibdon's jet ski modifications. Hibdon himself knowingly and consciously sought publicity for his jet ski business by his initial postings on rec.sport.jetski. The controversy began following Hibdon's posting on the news group of the success of his jet ski modifications, prior to the publishing of the defamatory statements made by the Defendants. The controversy was "public" due to the international reach of the Internet news group rec.sport.jetski, the national circulation of *SPLASH Magazine*, as well as the significance of the claims being asserted by Hibdon. The dispute as to the accuracy of Hibdon's claimed successes with modifying jet skis to achieve record-breaking speeds received public attention because its ramifications would be felt by persons who are not direct participants, those persons being individuals in the jet ski modification business, as well as recreational jet ski enthusiasts and purchasers of jet skis. This group includes individuals within the United States and many foreign countries. Further evidence of the breadth of the controversy is that Hibdon has also sued residents of Arizona, North Carolina, Texas and New Hampshire relating to postings those individuals made on rec.sport.jetski.[5] This Court finds that, as a matter of law, the

---

5

The Memorandum Opinion entered on May 14, 2003 in the case of *Hibdon v. ADA, Inc., et al.*, No. 4:01-CV-79 (E.D. Tenn. 2003) was included in the record before us on appeal. The U.S. District Court for the Eastern District of Tennessee granted summary judgment to the defendants ADA, Inc. and Wachendorf determining

(continued...)

dispute that is the subject of this lawsuit meets the criteria for one involving a public controversy and that, consequently, the trial court did not err in so finding.

Since a public controversy does exist, we now turn to the question of whether Hibdon's role in the controversy subjects him to the burdens of proof of a "public figure" for purposes of a libel action. The majority of libel cases in Tennessee have not dealt with the question of when a private individual rises to the level of "public figure" for purposes of a defamation action. Rather, the majority of Tennessee cases have addressed the question of whether government employees or political candidates and activists are public officials or figures.[6] However, states cannot be more restrictive than the United States Constitution requires in determining who is deemed a public official or figure for purposes of a defamation action. *Campbell v. Robinson*, 955 S.W.2d 609 (Tenn. Ct. App. 1997) (citing *Rosenblatt v. Baer,* 383 U.S. 75, 83-84, 86 S.Ct. 669, 15 L.Ed.2d 597, (1966)). As stated by the Tennessee Supreme Court in *Press v. Verran*, 569 S.W.2d at 441*,* the term "public figure" includes not only persons holding governmental positions but also those who "voluntarily inject themselves, or are drawn into public controversies, and become public figures for a limited range of issues." Other jurisdictions have readily found private individuals to be public

---

[5](...continued)

that, as a matter of law, no reasonable jury could find that any portion of Hibdon's damages were proximately caused by the single message for which plaintiff sought to hold defendants liable. The Eastern District Court of Tennessee found that Hibdon, for purposes of that libel action, was a "public figure" and that he was, accordingly, required to prove the actual malice of the defendants.

[6]

 *See, e.g., Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162 (Tenn. 1992) (ruling that county employee who had substantial responsibility for and control over financial affairs of the county was a public official for purposes of defamation action against newspaper), *Press , Inc. v. Verran,* 569 S.W. 2d 435 (Tenn. 1978) (finding that junior social worker in county office of State Department of Human Services, who had sufficient power to remove or cause parents' children to be taken from their custody was a public figure under the law of libel), *Piper v. Mize,* 2003 WL 21338696 (Tenn. Ct. App. 2003) (stating that both plaintiffs, one the wife of mayor of Clarksville who had been a guest writer for the local newspaper, and the second who was the incumbent Grants Writer for the City of Clarksville and former mayoral candidate were public figures within the parameters laid down by the Tennessee Supreme Court), *Murray v. Lineberry,* No. M2001-00097-COA-R3-CV, 2001 WL 1141352 (Tenn. Ct. App. 2001) (holding that sheriff's deputy was a public official for purposes of defamation action against candidate for office of sheriff), *Tomlinson v. Kelly*, 969 S.W. 3d 560 (Tenn. Ct. App. 2001) (finding members of city's board of commissioners were public figures and thus required to show actual malice in defamation action), *Campbell v. Robinson*, 955 S.W.2d 609 (Tenn. Ct. App. 1997) (holding that public school teacher was a public official in libel action), *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69 (Tenn. Ct. App. 1986) (ruling that chairman of "Citizens for Tax Reform" group whose activities included dealings with governmental affairs was a public figure for purposes of libel action), *Cloyd v. Press, Inc.*, 629 S.W.2d 24 (Tenn. Ct. App. 1981) (finding that plaintiff in action who had prepared, circulated and filed petitions requiring town referendum and purchased advertising in newspaper representing his position injected himself into public controversy and was thus a public figure for purpose of libel action), *Moore v. Bailey*, 628 S.W.2d 431 (Tenn. Ct. App. 1981) (holding that a county environmentalist for the State Department of Health was a public official).

-10-

figures for purposes of defamation actions.[7]  Furthermore, the United States Supreme Court has solidified the view that if one, by his own volition, thrusts himself on the passing scene to the extent that he knowingly and consciously wants and needs publicity or public support for his endeavors or activities, he submits himself to public scrutiny, which may justly expose his affairs as they might relate to the activities or endeavors for which he is seeking public approval and deems him a "public figure" for matters relating to those endeavors and activities.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974); *Ocala Star Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971).

---

[7]

*See, e.g., DiBella v. Hopkins,* 403 F.3d 102 (2d Cir. 2005) (ruling former television executive who ran promotions and television packaging business was public figure for purposes of libel claim, given his achievements in boxing industry and his success in garnering public's attention by organizing and promoting boxing bouts seen by cable subscribers); *Alpine Industries Computers, Inc. v. Cowles Pub. Co.,* 114 Wash. App. 371, 57 P.3d 1178 (Wash. Ct. App. 2002) (ruling that statements at issue in newspaper article relating to software manufacturer's copyright infringement action against local retailer addressed public concern of software privacy, and therefore retailer was required, despite being a private figure plaintiff, to prove in defamation action that publisher acted with actual malice, i.e., that it acted with actual knowledge of falsity, or with reckless disregard as to the truth or falsity, of the story); *Nadel v Regents of University of California,* 28 Cal.App.4th 1251, 34 Cal.Rptr.2d 188 (Cal. Ct. App., 1994) (holding that court did not err in finding that activist-protesters were limited purpose public figures who had to demonstrate actual malice where they spoke publicly at city council meetings and at political and cultural rallies, where one of them wrote letter to editor of local newspaper and spoke to print media reporters who included his comments about park, and regularly staffed "information table" at park); *Martinez v Soignier*, 570 So. 2d 23 (La App 3d Cir. 1990) (holding that the plaintiff doctor was a public figure for purposes of a defamation action against a plastic surgeon who allegedly defamed plaintiff by making oral statements that plaintiff was untrained, unqualified, a "quack," and fraudulent. The court noted that plaintiff advertised in the Yellow Pages under numerous advertising headings, that he performed cosmetic breast surgery.  The court found that plaintiff sought public patronage and that his venture into breast augmentation was a matter of public interest, concluding that, considering the totality of the evidence, that plaintiff was a public figure); *Kelly v State,* 131 A.D.2d 176, 520 N.Y.S.2d 959 (N.Y. App. Div., 1987) (holding that the plaintiff, a licensed private investigator who specialized in "deprogramming" religious cultists, was a public figure for purposes of a defamation action against the state police based on a press release detailing his arrest following an altercation with cult members. The court found that while plaintiff may not have sought the state and national publicity he received, he was, nonetheless, involved in a field, the deprogramming of cultists, which at the time attracted national interest. The court also noted that the plaintiff was not reluctant to submit to interviews or to testify on the subject, nor did he resist the publicity that followed); *Brake & Alignment World Supply Corp. v Post-Newsweek Stations of Florida, Inc.*, 472 So.2d 517 (Fla. Dist. Ct. App., 1984) review den (Fla) 484 So.2d 7 (finding that bicycle repair shop franchisor, by virtue of its advertising activities and access to the media, was a public figure for purposes of its defamation action against a television station relating to settlement of a consumer fraud action against one of its franchisees); *James v Gannett Co.* 40 N.Y.2d 415, 353 N.E.2d 834, 386 N.Y.S.2d 871 (N.Y. 1976) (stating the plaintiff, a professional belly danger, was a public figure for purposes of an allegedly defamatory article about her performance. The court noted that the category of "public figures" was of necessity quite broad, including, without doubt, many types of public performers such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists. The court found that the plaintiff welcomed publicity regarding her performance and, therefore, must be held to be a public figure with respect to newspaper accounts of those performances, and by her purposeful activity, she thrust herself into the public spotlight and sought a continuing interest in her activities).

In light of the above factors, and using the criteria set forth by the Tennessee Supreme Court in *Press, Inc. v. Verran,* the trial court correctly identified Mr. Hibdon as a limited purpose public figure. There is no question that Mr. Hibdon injected himself into the public controversy voluntarily by boasting about his jet ski modifications and speeds thereof on rec.sport.jetski. Hibdon had access to and used effective means of communication, both through the news group and through *SPLASH Magazine*, in order to counteract the Defendant's statements. Furthermore, as the figure at the center of the controversy, Hibdon's role was extensive. Upon consideration of the above factors, as a matter of law, we find that the trial court correctly characterized Mr. Hibdon as a "public figure".

As a limited purpose public figure, Hibdon has the burden of proving by clear and convincing evidence that the Defendants' published statements were made with knowledge of the statement's falsity or with reckless disregard of its truth or falsity. *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the case of *In re C.W.W.,* 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)*,* this Court provided the following parameters covering the "clear and convincing evidence" standard:

> Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992); *O'Daniel v. Messier,* 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier,* 905 S.W.2d at 188; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer,* 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts,* 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright,* 838 S.W.2d at 536.

*Id.* at 474.

The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure; rather, it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity. *McWhorter v. Barre*, 132 S.W.3d 354, 365 (Tenn. Ct. App. 2003). Likewise, statements that cannot "reasonably [be] interpreted as stating actual facts about an individual" because they are expressed in "loose, figurative or hyperbolic language," and/or the content and tenor of the statements "negate the impression that the author seriously is maintaining an assertion of actual fact" about the plaintiff are not provably false and, as such, will not provide a legal basis for defamation. *Milkovich v. Lorain Journal*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed. 1 (1990). In reviewing the propriety of the trial court's grant of summary judgment

to the Defendants in this case, we must determine, upon taking the evidence in the light most favorable to Mr. Hibdon, whether reasonable minds must agree that malice, as defined in the context of libel suits against public figures, has not been proven by clear and convincing evidence. *McCluen v. Roane County Times, Inc.,* 936 S.W.2d 936, 939 (Tenn. Ct. App. 1996) (citing *Goode v. Tamko Asphalt Products, Inc.*, 783 S.W.2d 184 (Tenn. 1989)).

For material evidence sufficient to meet his burden of proving with clear and convincing evidence that the statements made by the Defendants were made with actual malice, we now turn to the record.

GRABOWSKI

George Grabowski ("Grabowski") is a resident of Paducah, Kentucky, where he operates a jet ski customizing business known as HPT Sport USA. Hibdon alleges that Grabowski published numerous libelous statements regarding Hibdon on the Internet news group rec.sport.jetski as well as on Grabowski's business website under a category called "Chop Shop." According to Hibdon's Amended Complaint, the following is a statement which was published on rec.sport.jetski. According to Hibdon, the statement was made by Grabowski, about Hibdon, to wit:

> March 10, 2001: Grabowski published a post referring to Billy Morris, Sr., and Jr., alleging that this "Father and son team, and who know how many more, [were] shafted really good, not to mention money and aggravation," by the Plaintiff. In truth, as Grabowski knew, the Morrises were satisfied customers of the Plaintiff and had published many internet postings favorable to the Plaintiff and his work.

TALLEY

Larry Talley ("Talley") is a citizen of LaVergne, Tennessee. According to Hibdon's Amended Complaint, Talley purchased a modified stroker engine for his jet ski from Hibdon in 1999. Talley traded in his original equipment and paid an additional $2,500 to Hibdon for the engine, which was equipped with an aftermarket exhaust pipe and aftermarket carburetors. Hibdon stated that the engine was not under warranty and that Defendant Talley was aware of the lack of warranty when he purchased the modified engine. In the Amended Complaint, Hibdon states that Talley's engine had a number of failures, some of which were due to Talley's misuse, some of which were due to defective pistons, and, on occasion, some of which were due to an error made by Hibdon. Hibdon asserts that he provided Talley with free parts and labor amounting to several thousand dollars in order to repair the jet ski.

Hibdon alleges that Talley began publishing statements regarding Hibdon's work on Talley's jet ski engine. While at first complimentary, Talley's comments later turned very critical

of Hibdon and his business.  In his Amended Complaint, Hibdon presents the following Internet posting allegedly sent by Talley and referencing the article in SPLASH Magazine:[8]

> "It is all truth, you know what they say what goes around comes around and I for one have purchased my last Sub. to the Splash Mag. I think [t]he Editor at large should go down to Augusta, Ga. and do a story on those Ultra 150's - what a story that would be I believe there is 4 of them [referencing Billy Morris, Sr. and Billy Morris, Jr. and two other customers of Hibdon] that are having problems or should I say I am sure of it."  Talley's post was false and defamatory because neither of the Morrises were dissatisfied with [Hibdon's] work.

In support of his opposition to summary judgment, and as evidence of the reckless disregard for the truth with which Grabowski and Talley acted, Hibdon submits the Affidavit of Billy Morris, Sr., which reads, in pertinent part, as follows:

> I have had Kerry Hibdon do work on my jetskis to improve performance.  I have been very satisfied with the work Kerry has done for me, both in terms of the improved performance and the durability of his work. . . . I posted messages on the newsgroup in behalf of Kerry and reported that my experiences with Kerry and his work had been positive.  I never gave anyone, specifically including George Grawbowski and Larry Talley, reason to believe that I was dissatisfied with the work that Kerry Hibdon had done for me.

In further support of his position that Grabowski and Talley acted with actual malice, Hibdon submits the Affidavit of Billy Morris, Jr.  The Affidavit states that Billy Morris , Jr. was very satisfied with the work Hibdon did on his jet ski.  Billy Morris, Jr. also states that he had posted messages that he was satisfied with Hibdon's work, and that he had never given anyone, specifically Grabowski and Talley, reason to believe otherwise.  From the above referenced statements, it appears to this Court that there is a dispute of material fact as to whether the statements of Defendants Grabowski and Talley were made with reckless disregard of their truthfulness.  Consequently, disposition by summary judgment is not appropriate as to Defendants Grabowski and Talley.

REELS

---

8

 It is unclear from the record whether the postings on the Internet by Talley were on the news group rec.sport.jetski or on another Internet location.

-14-

Ronnie Reels ("Reels") is a resident of Cookeville, Tennessee. Hibdon alleges that, in the summer of 1999, he sold Reels a set of heads, which Hibdon had modified for use on Reels' Kawasaki Ultra jet ski. Hibdon asserts that, with the new heads, Reels' jet ski performed reliably and satisfactorily on pump gas throughout the 1999 season. Hibdon also asserts that, in 2000, Reels installed new carburetors on this same jet ski without Hibdon's participation. According to Hibdon, Reels failed to properly adjust the carburetors and his engine failed. In an Internet post dated June 7, 2000, Reels addresses Hibdon as follows:

> Yeah I did blow up my own boat. My fault . . . The heads you milled for me ran great on a stock boat. But when I added carbs them and the ignition advance was just too much.

Thereafter, Hibdon alleges that Reels began publishing libelous statements regarding Hibdon's work while, at the same time, sending Hibdon private e-mails seeking help and pledging support. Hibdon presents the following series of e-mails and Internet postings allegedly sent by Reels:[9]

> June 23, 2000: Reels posted on the internet a message asserting: that he had followed the Plaintiff's "advice and mods to a T," when, in fact, Reels had added new carburetors on his jet ski without Plaintiff's knowledge.

> On or about June 23, 2000, Reels posted on the internet: Hibdon's work had caused Reels to "have to spend $$$" on corrective measures.

> June 27, 2000, Reels in an e-mail to Hibdon: asked for assistance to restore his jet ski to its former performance after Reels and others have modified it. Reels stated that "I just want my boat running at its peak and I know that your one of the few Kawasaki guys that can achieve that . . . Your good at Kawasakis . . . Reason I didn't buy carbs from you in first place was money. I bought them used from a guy in Florida for substantially less than new."

> July 25, 2000, Reels posted on the internet a message asserting that Plaintiff had tried to cheat him and that Reels had been caused "headaches, time and money" because he had trusted the Plaintiff.

> August 30, 2000, Reels posted on the internet the message "I am reminded every month when I get my credit card bill of the thousand

---

9

  It is unclear from the record whether the postings on the Internet by Reels were on the news group rec.sport.jetski or on another Internet location.

plus $$$ I had to spend with Kerry's bochery head work caused [m]y Ultra to break."

From the above referenced statements, it appears to this Court that there is a dispute of material fact as to whether the statements of Defendant Reels were made with reckless disregard of their truthfulness. Consequently, disposition by summary judgment is not appropriate as to Defendant Reels.

PACE

Fagan Pace ("Pace") is a resident of Hopkinsville, Kentucky. He is a firefighter by profession but has done some jet ski work under the name of PaceTech. Hibdon alleges that Pace published, on rec.sport.jetski, numerous libelous statements regarding the quality and reliability of Hibdon's work and business practices. Hibdon also asserts that Pace implicated Hibdon in a scheme to present false information regarding the speed, performance and testing of Hibdon's jet skis to the public. Specifically, in his Complaint, Hibdon states:

> On June 24, 2000: the defendant Larry Talley published a statement expressing his satisfaction with a used STX stroker engine the Plaintiff had modified and sold to Talley two years previous. Talley's post also stated that the Plaintiff "spent his own money not mine in making things right (stood behind his work)."

> October 27, 2000: Pace published statements that the Plaintiff had sold Talley an "unreliable motor," that the Plaintiff had "misrepresented the condition of the motor and it's reliability," that the Plaintiff had sold Talley "used junk parts at full retail price," and that Talley had "spent well over $3000 and a perfectly reliable engine and he got a timebomb in return."

> Also on October 27, 2000: Pace published a statement that the Plaintiff's wife's jetski, which the Plaintiff had modified, had been towed in 4 weekends in a row. This false and defamatory statement implied that the Plaintiff's work had been faulty and had been the cause of breakdowns on four consecutive weekends. In truth, the jetski had provided excellent performance and reliable service until it suffered water infusion damage after it was overturned by Mehaffey.

> May 3, 2001: Pace sent a post to Jim Milliken, a customer of the Plaintiff, accusing Milliken of misleading people by implying that Milliken was happy with the results of the Plaintiff's work. Pace

-16-

added that "[y]ou and I both know what I mean. OK?" The implication that the Plaintiff's work was deficient or had dissatisfied Milliken was false and defamatory.

After Milliken published a post in response chastising Pace for accusing him of misleading anyone, and affirming his satisfaction with the work performed by the Plaintiff, Pace responded with another post to Milliken, to wit, "[s]o your happy the chopshop stripped and or crossthreaded your driveshaft? . . . No thanks:))" The statement that the Plaintiff had stripped and or crossthreaded Mr. Milliken's driveshaft was false and defamatory.

In support of his motion in opposition to summary judgment, and as evidence of the reckless disregard for the truth with which Pace acted, Hibdon submitted the Affidavit of Jim Milliken. The Affidavit reads, in pertinent part, as follows:

I hired Kerry Hibdon to do work on my GP1200 jetski to improve its performance. I was very satisfied with the work Kerry did for me, both in terms of the improved performance and durability of his work. I published truthful messages on rec.sport.jetski reporting my positive experiences with Kerry and his modifications. I had had no problems with the jetski that Kerry had modified for me until I made the mistake of putting the wrong octane gas in the jetski, which caused the engine to seize. Kerry did not do the repair work following this engine seizure.

I am aware that many of the defendants in this case have posted messages on the internet newsgroup rec.sport.jetski, in which they attacked Kerry Hibdon both personally and professionally. I posted messages on the newsgroup on Kerry's behalf, and I specifically and truthfully stated that the engine seizure I had had was my own fault. A number of the defendants in this case posted messages on the newsgroup in which they claimed I was lying about this, and that I was dissatisfied with his work, though I insisted that I was telling the truth. I did suggest that James Mehaffey consider taking his jetski to Dan Lamey in California for modifications instead of Kerry because Kerry specialized in Kawasaki jetskis and not Yamahas such as Mr. Mehaffey's. In making this suggestion, I was in no way being critical of Kerry or his work.

I subsequently purchased another jetski, a GPR, and had several tuners other than Kerry work on it. I had identified these other tuners on the newsgroup. I was not satisfied with the performance of this jetski, so I later took it to Kerry. As Kerry and I were working on the jetski, we

-17-

discovered that the driveshaft had been stripped or crossthreaded such that it was extremely difficult to remove the impeller. Whomever had stripped or crossthreaded the driveshaft had done so before I took the jetski to Kerry. Kerry was not responsible for this problem, and I never told anyone that he was.

From the above referenced statements, it appears to this Court that there is a dispute of material fact as to whether the statements of Defendant Pace were made with reckless disregard of their truthfulness. Consequently, disposition by summary judgment is not appropriate as to Defendant Pace.

PENNINGTON

Ben Pennington ("Pennington") is a resident of Columbia, Tennessee. Hibdon alleges that Pennington sent public Internet messages,[10] which constitute libels in that they accuse Hibdon of performing unsafe and substandard work on numerous jet ski modifications. Specifically, in his Complaint, Hibdon states:

> June 21, 1999: the defendant Ben Pennington sent a post addressed to the defendant Grabowski, stating that the Plaintiff was one of "the best jetski riding buddies a guy could ask for. Scratch that; [one of the] best buddies anywhere. Pennington stated that, "I can't even keep up with how many Ultra's Kerry modified in the parking lot of the boat ramp. Best money any of those Ultra owners will probably ever spend on their ski." Pennington referred to Grabowski as, "[a] jealous, bitter old man who truthfully has mental problems that will probably never be attended to properly.

> September 11, 2000: Pennington sent a public internet message to Jim Milliken asserting that the Plaintiff had installed heads on

---

[10]

It is unclear from the record whether the postings on the Internet by Pennington were on the news group rec.sport.jetski or another Internet location.

the defendant Reels's jet ski which were "no where near pump gas safe" and had caused Reels's jet ski to blow up. He asserted that the defendant Talley had been "screwed over" by the Plaintiff. He implied that Milliken's jet ski had seized on numerous occasions after the Plaintiff had worked on it, and that Milliken had traded the jet ski "with mixed and matched pistons . . . just to get rid of it." All of these statements were false and defamatory. The heads the Plaintiff had installed on Reel's jet ski were pump gas safe and the Plaintiff had not done anything to Reel's jet ski to cause it to blow up.

December 31, 2000, Pennington sent a post to Jim Milliken confirming that Milliken had been "kicked" from Pennington's jet ski club because, according to Pennington, Milliken had been "spreading misinformation about how great Kerry's work was while ignoring the undeniable truth," e.g., the kind of truth presented on Grabowski's website.

January 24, 2001, Pennington, under the internet subject, "Big Load of Greased Moose Poop," published a message regarding *SPLASH Magazine's* favorable discussion of the Plaintiff's jet ski. Pennington wrote, "Everyone in this group has known for months now exactly what kind of engine work the Jetshop puts out by looking at the pictures from [Grabowski's website] and there is no refuting the facts that those pictures back up."

From the above referenced statements, in addition to the Affidavit of James Milliken, it appears to this Court that there is a dispute of material fact as to whether the statements of Defendant Pennington were made with reckless disregard of their truthfulness. Consequently, disposition by summary judgment is not appropriate as to Defendant Pennington.

Turning to the element of damages, we find that the record contains material evidence that Hibdon's reputation and standing in the community of jetski enthusiasts has been impaired by the defamatory publications of the Defendants. Under Tennessee law, a plaintiff is required to prove actual damages in all defamation cases. *Handley v. May,* 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979). *See also McWhorter v. Barre*, 132 S.W.3d 354 (Tenn. Ct. App. 1997). The actual damage requirement was discussed by the United States Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974):

We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood

-19-

include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

*Id.* at 349-50, 94 S.Ct. at 3012. The failure to prove special damages or out-of-pocket losses is not necessarily determinative. *Handley,* 588 S.W.2d at 776. The issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering. *Id.*

In his own Affidavit, Hibdon testifies that the statements published on the newsgroup rec.sport.jetski by the Defendants caused him great emotional distress to the point that he was unable to focus on his work or on his family. Further, Hibdon states that the stress led him to seek help from a therapist, whom he had discontinued seeing over a year before the newsgroup postings. April Hibdon, Kerry Hibdon's wife, stated in her Affidavit that the Defendants' newsgroup postings made her husband alternatively "very angry," or " very sad and withdrawn." April Hibdon further states that, after being attacked on the newsgroup by the Defendants, her husband would pay little attention to their son, to her or to either his business ventures. In their respective affidavits, both Billy Morris, Sr., and Billy Morris, Jr, state that the posts were damaging to Hibdon's reputation in the jetski community. Moreover, Jeff Ames, the *Splash Magazine* editor who authored the articles that featured Hibdon, offered the following evidence of Hibdon's actual injury in his Affidavit submitted in support of Hibdon's opposition to the motion for summary judgment:

> Release of the article on the 80 mph Kawasaki Ultra led to a new wave of attacks against Kerry Hibdon on rec.sport.jetski. There even were charges asserting that the tests results I had reported in the article had been falsified. I tried to respond to these ridiculous charges both privately and on the newsgroup, but the dark cloud over Mr. Hibdon was growing and spreading. Mr. Hibdon's reputation had been damaged and my association with Mr. Hibdon was damaging my reputation. Although I have no first hand knowledge that any of the charges made against Mr. Hibdon on the newsgroup were true, and although I personally had not had any problems with Kerry Hibdon, the adverse newsgroup publicity regarding Kerry Hibdon was such that I told Kerry that SPLASH was going to have to pull back and discontinue the working relationship it had had with him.

The Defendants, in their Memorandum in Support of Summary Judgement assert that:

> "Mr. Hibdon had admitted that no one else in his community of McMinnville, Tennessee, is aware of the messages posted on the newsgroup. Hibdon Dep. P. 370. He has testified that no one else in

his community thinks less of him because of the message. Hibdon Dep. P. 370. He concedes that his standing in his hometown of McMinnville has changed and that he had had no negative publicity outside the newsgroup. Hibdon Dep. P. 367. . . Mr. Hibdon states that his damage consists of "sleepless nights" and that the comments on the newsgroup "caused me a lot of grief." Hibdon Dep. P. 215, 295.

However, we note that the Defendants take these statements from the deposition testimony of Hibdon which was given in the case of *Hibdon v. ADA, Inc.*, *supra* note 6. Concerning the alleged lack of actual damage to Hibdon's reputation and standing in the community, the cited portions of the deposition read in pertinent part, as follows:

Question: [Have] any of your other friends or acquaintances disassociated themselves with you as a result of the alleged ADA or Mike Cazelet postings?

Hibdon: Not specifically that I know of.

Question: Any negative publicity outside the news group as a result of the defamatory remarks that were made therein [by ADA or Mike Cazelet]?

Hibdon: I don't think so.

Question: Is the primary aspect of your claim, humiliation and embarrassment your reputation has sustained?

Hibdon: It sure has caused me a lot of grief.

Question: Grief?

Hibdon: Yes.

Question: Humiliation?

Hibdon: Yes.

Question: Embarrassment?

Hibdon: Yes, pain and suffering.

Question: Pain and suffering. What kind of pain and suffering?

Hibdon: Emotional pain and suffering.

Question: Okay. You've been emotionally damaged as a result?

Hibdon: Yes.

Question: To what degree?

Hibdon: Very much so.

Question: Okay.?

Hibdon: Sleepless nights.

As noted above, these responses were given by Hibdon in a deposition for a previous trial, which was related to an entirely different set of defendants and to an entirely separate set of alleged libels. The Defendants have construed Hibdon's responses in his previous deposition to make it appear as if Hibdon is responding to questions about damages resulting from the comments made by the Defendants in the present case. The statements extracted from this deposition are not material to the present case as they offer no proof of the lack of damages in the cause of action by Hibdon against Defendants Grabowski, Pace, Pennington, Reels and Talley.

It appears to this Court that there is sufficient evidence on the issue of Hibdon's damages to survive summary judgment. Consequently, disposition by summary judgment is not appropriate on the issue of actual damages.

Jurisdiction

Defendants Grabowski and Pace filed motions to dismiss the Complaint on grounds of lack of personal jurisdiction. The trial court denied their motions and they now appeal. In their motions to dismiss, Defendants Grabowski and Pace state that they are residents of Kentucky and that they lack the necessary minimum contacts with the state of Tennessee for the court to have personal jurisdiction over them. We disagree. This Court held, in *United Agricultural Services, Inc. v. Scherer,* that in the absence of general jurisdiction resulting from continuous and systematic contacts with the forum state, specific personal jurisdiction still may be found without violating the due process clause when an actor purposely directs his activities toward citizens of the forum state and litigation results from injuries arising out of or relating to those activities. *United Agricultural Services, Inc. v. Scherer,* 17 S.W.3d 252, 256-57 (Tenn. Ct. App. 1999). In such a case, "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. V. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980); *Shoney's, Inc. V. Chic Can Enterprises,* 922 S.W,2d 530, 536 (Tenn. Ct. App. 1995). When a controversy is related to or "arises out of" a defendant's contacts with the forum, the United States Supreme Court has said that a "relationship among the defendant, the forum, and the litigation" is the essential foundation of *in personam* jurisdiction. *Helicopteros Nacionales,* 466 U.S. at 414, 104 S.Ct. at 1872 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)).

The United States Supreme Court stated "[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174 (1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984).

In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-1240, 2 L.Ed.2d 1283 (1958):

> "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201 (1957); see also *Kulko v. California Superior Court,* 436 U.S. 84, 94, n. 7, 98 S.Ct.1690. 1698, n. 7 (1978).

In the present case, Grabowski and Pace personally directed many of their Internet messages to residents of Tennessee, specifically fellow defendants Pennington, Reels and Talley. The claims of defamation against Grabowski and Pace arose specifically from injuries arising out of or relating to those Internet messages. Therefore, we hold that the trial court properly exercised personal jurisdiction over Defendants Grabowski and Pace.

Venue

Defendants Grabowski, Pace, Reels, Talley and Pennington filed motions to dismiss the complaint on grounds of improper venue which the trial court denied and the Defendants now appeal. In their motions to dismiss, the Defendants state that none of the Defendants are residents of Warren County, Tennessee nor did Hibdon's alleged cause of action accrue in Warren County. Arguing that the tort action of defamation is a transitory action for venue purposes, the Defendants claim that venue is only proper when a defendant resides in the county where the suit is filed, or where the cause of action arose. However, under Tennessee law, where a plaintiff claims damages for tortious acts committed in one county, which cause injury in another county, the cause of action for venue purposes can be deemed to have accrued in the county where the injury accrued. *See Nelson v. Ford Motor Credit Company*, 590 S.W.2d 457, Tenn. Ct. App. (1979) (holding that where corporation's letters and telephone calls concerning installment payments on automobile originated in Knox County, although the alleged injury to debtors occurred in Roane County where the debtors resided and where the letters and telephone calls were received, the debtor's cause of action accrued in Roane County for venue purposes). Accordingly, we hold that Hibdon's cause of action accrued in Warren County, and that the trial court correctly held that venue in Warren County was proper.

For the foregoing reasons, we affirm the Order of the trial court to the extent that it holds that venue is proper in Warren County, Tennessee and to the extent that it holds that personal jurisdiction is proper over Defendants Grabowski and Pace. We reverse the Order of the trial court to the extent that it grants summary judgment in favor of the Appellees. We remand for such further proceedings as may be necessary consistent with this Opinion. Costs on this appeal are assessed against the Appellees, George Grabowski, individually and d/b/a HPT Sport USA, Fagan Pace, individually and d/b/a Pace Tech, Ben Pennington, Ronnie Reels and Larry Talley.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.