William V. TRIGG, Plaintiff-Appellant,

v.

LAKEWAY PUBLISHERS, INC., d/b/a The Elk Valley Times, and Mrs. Dorothy Thompson, Defendants-Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 1, 1986.

Application for Permission to Appeal Denied by Supreme Court Oct. 27, 1986.

Scott Daniel, Murfreesboro, for plaintiff-appellant.

James H. Henry, II, Henry & McCord, Tullahoma, for defendant-appellee, Lakeway Publishers, Inc.

Robert W. Stevens, Stevens, Bagley & Stevens, Fayetteville, for defendant-appellee, Mrs. Dorothy Thompson.

## OPINION

LEWIS, Judge.

Plaintiff William V. Trigg filed his complaint against defendants, Lakeway Publishers, Inc., d/b/a The Elk Valley Times (Times), and Mrs. Dorothy Thompson (Thompson), and alleged that the defendants published or caused to be published "certain false, scandalous, defamatory and malicious writings" about him.

Each defendant answered, denying all material allegations of the complaint, and thereafter, following the taking and filing of certain depositions and affidavits, moved for summary judgment.

Thereafter, the trial court, upon consideration of the entire record, found that plaintiff was a "public figure" and that he had "failed to establish with admissible evidence in a clear and convincing way that defendants acted with actual malice and, therefore, defendants are each entitled to a summary judgment."

Following the entry of the order sustaining each of the defendant's motion for summary judgment and the dismissal of his complaint, plaintiff appealed.

The facts pertinent to our inquiry are as follows:

Plaintiff was a member, chairman, and spokesman for a group of citizens of Lincoln County who styled themselves "Citizens for Tax Reform" and who were, according to plaintiff, interested in the governmental affairs of Lincoln County.

Plaintiff and other members of his group held public meetings in various locations in Lincoln County. They met with Leonard Mansfield, County Judge of Lincoln County, and with various members of the Lincoln County Commission, the budget committee in particular, on several occasions.

In either 1980 or 1981, the Lincoln County Road Superintendent had been ousted from office. Prior to leaving office the Superintendent had presented blank checks to Judge Mansfield for his signature. Judge Mansfield signed the blank checks which were later made payable to the attorneys who had represented the Road Superintendent in his ouster suit. Plaintiff or members of his group or both subsequently learned that county road funds had been used to pay the Road Superintendent's attorney's fees. Plaintiff and some members of the group met on November 12th with Judge Mansfield, eleven members of the County Commission, the County Attorney, and others and demanded Judge Mansfield's resignation within one week or

threatened to file an ouster suit.[1] Plaintiff was the only spokesman for his group at the November 12th meeting in which the ultimatum was delivered. Subsequent to this meeting, defendant Thompson caused the following petition to be drafted and circulated:

THE RESPONSIBLE CITIZENS SPEAK

We, the undersigned citizens and taxpayers of Lincoln County, do hereby announce our support and confidence in the Honorable Leonard Mansfield, County Judge, and the other public officials of our county.

We deeply resent and abhor the attempt by a tiny group of persons who have made reckless, irresponsible and slanderous charges against him and our other county officials with total disregard for the truth.

The petition was drafted by a Fayetteville attorney, Fred Womack, on Saturday, prior to the Thursday, November 19, 1981 edition of the Times. Between the time of the drafting of the petition and Thursday, November 19, 1981, Mrs. Thompson and others obtained some 636 signatures on the petition.

The petition was taken to the Times by Thompson and was run in the Times as a paid advertisement on pages 6B and 7B of the November 19, 1981 edition. At the time she took the petition to the Times, she had no discussion with anyone except as relating to the cost of publication of the petition.

Subsequent to the petition being taken to the Times, Jimmy Simms, the Times' government reporter, talked with Mrs. Thompson in order to secure background for a possible news story. After talking with Thompson, Simms contacted plaintiff. Simms stated that he contacted plaintiff because plaintiff had been the spokesman for a group opposing Judge Mansfield. After talking with both plaintiff and Thompson, Simms wrote an article which was placed on the front page of the November 19th edition and quoted both Thompson and plaintiff extensively. The article also referred to the petition.

Plaintiff insists that the petition was directed at him and his group, and that the accompanying front-page article specifically referred to plaintiff, identifying him with the "aforesaid reckless, irresponsible and slanderous charges against Judge Mansfield and other county officials." He also alleged that "all the charges were false and known by the defendants to be false and that they were made against plaintiff with reckless disregard for the truth and did in fact result in damage to his occupation and reputation."

The record shows that although plaintiff had a good relationship with the Times and that he visited the Times after the article was published, he did not ask for a retraction or make any comment whatsoever that he was dissatisfied. He did request a retraction, through his attorney, approximately one year after publication and shortly before filing the instant suit.

On December 1, 1981, plaintiff and other members of his citizens group filed suit against Judge Mansfield, the former County Road Superintendent, and their bonding companies in an effort to obtain repayment of the superintendent's legal fees funded by the County in connection with the Superintendent's ouster suit.

Plaintiff correctly contends that summary judgment is not available where a genuine issue of fact exists.

In determining whether or not a genuine issue of fact exists in a summary judgment case, the trial court and this Court on appeal must look at all the evidence, take the strongest legitimate view of it in favor of the opponent of the motion and allow all reasonable inferences from it in his favor, discard all countervailing evidence, and if then there is any dispute as to any material determinative evidence or any doubt as to

1. The Attorney General for the State of Tennessee had rendered an opinion prior to that meeting that Judge Mansfield was a county judge and, under the Tennessee Constitution, was not subject to ouster.

the conclusion to be drawn from the whole evidence, the motion must be denied. *See Phillips v. Pittsburgh Consolidated Coal Co.,* 541 S.W.2d 411, 413 (Tenn.1976); Tenn.R.Civ.P. 56.03. He argues that genuine issues exist as to whether he is a public or private figure and that even if he were held to be a public figure, a genuine issue exists regarding the existence of actual malice.

The Tennessee Supreme Court, in *Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn. 1978), adopted standards 580A and 580B, *Restatement (Second) of Torts* (1977), which read as follows:

> § 580A. *Defamation of Public Official or Public Figure.* One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he
>
> (a) knows that the statement is false and that it defames the other person, or
>
> (b) acts in reckless disregard of these matters.
>
> § 580B. *Defamation of Private Person.* One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
>
> (a) knows that the statement is false and that it defames the other,
>
> (b) acts in reckless disregard of these matters, or
>
> (c) acts negligently in failing to ascertain them.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), the Court stated:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967), the rule was extended to defamation of "public figures" who were involved in "public issues." The Court determined that a public figure is one who "may have attained that status by position alone ... [or] by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but ... commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Id.*

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court further defined a public figure, as follows:

> For the most part those who attain this status have assumed roles of an especial prominence in the affairs of society. Some occupy positions of such persuasic power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

In *Cloyd v. Press, Inc.*, 629 S.W.2d 24, 25–26 (Tenn.App.1981), this Court, in reaching a determination of whether plaintiff was a public figure, stated:

[D]oes a public controversy exist, and what is the nature and extent of the individual's participation in that controversy. The nature and extent of the individual's participation is determined by looking to three factors: the extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication in order to counteract false statements, and the prominence of the role played in the public controversy.

■ If plaintiff is a public figure, he may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

The Court of Appeals for the Sixth Circuit has stated:

*Gertz* provides general guidelines to assist the media and the courts in determining whether an individual is a public figure: does a public controversy exist, and what is the nature and extent of the individual's participation in that controversy. The nature and extent of the individual's participation is determined by looking to three factors: the extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication or order to counteract false statements, and the prominence of the role played in the public controversy.

*Wilson v. Scripps-Howard Broadcasting Co.*, 642 F.2d 371, 374 (6th Cir.1981) (quoted with approval in *Cloyd v. Press, Inc.*, 629 S.W.2d 24, 25–26 (Tenn.App.1981)).

In 1980, plaintiff and a group of other Lincoln County citizens formed "Citizens for Tax Reform." Public meetings were held throughout the County by "Citizens for Tax Reform." These meetings were advertised in the newspaper and members of the Lincoln County Commission were specifically invited to the meetings. Plaintiff was elected chairman of "Citizens for Tax Reform" and was its chief spokesman.

As spokesman and chairman of "Citizens for Tax Reform," plaintiff contacted Judge Mansfield asking him to correlate the construction projects performed in Lincoln County with a list of convicted bidriggers, and plaintiff and several members of his group met with Judge Mansfield to discuss the project. Plaintiff was the chief spokesman at these meetings.

Members of the group attended various county commission meetings and formed a complementary county government whereby certain members of plaintiff's group, including plaintiff, selected particular county government officials and "shadowed" those officials. The members selected would attend meetings and follow their governmental counterparts.

In November, 1981, plaintiff and other members of his group met with Judge Mansfield, eleven members of the County Commission, the County Attorney, and others. At this meeting, plaintiff was the only spokesman and called on Judge Mansfield to either resign or threatened that a suit would be filed to oust him as a result of his (Judge Mansfield's) participation in the signing of blank checks for the payment of the Road Superintendent's legal fees.

Prior to the November 1981 meeting, plaintiff had been quoted extensively in the *Times* as spokesman for the taxpayers group. He had also been quoted in Nashville, Tennessee, and Huntsville, Alabama, newspapers.

Prior to the publication of the petition and news story on November 19, 1981, plaintiff would bring information to the *Times* office regarding his activities on behalf of the citizens group. This included taped conversations he had had with Judge Mansfield.

The record is clear that due to his activities plaintiff was well known in dealing with governmental affairs by those with whom he had associated and by anyone who read the newspapers. He had re-

ceived extensive coverage in the newspapers prior to the publication of the petition.

There is no question that a public controversy existed, that plaintiff injected himself into the public controversy, and that his extensive participation brought about much of the controversy.

■ There is no genuine issue of fact regarding whether plaintiff was a public figure. The trial court correctly found that he was in this instance a public figure.

Plaintiff also contends that summary judgment was inappropriate even if he was a public figure because there is a genuine issue of fact of whether the *Times* and Thompson were guilty of "actual malice."

> ... *New York Times Co. v. Sullivan* [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth [and] [u]nless the court finds, on the basis of pretrial affidavits, depositions, or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment.

Wright, J., concurring, *Wasserman v. Time, Inc.*, 424 F.2d 920, 922 (D.C.Cir.), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970).

"[A] public figure cannot resist a newspaper's motion for summary judgment under Rule 56 by arguing that there is an issue for the jury as to malice unless he makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred." *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774, 776 (D.C.Cir.1968).

Whether there is "actual malice" is a proper question to be decided on motion for a summary judgment.

On motion for summary judgment where plaintiff, as in this case, is a "public figure," it is incumbent upon him to show "actual malice" with "convincing clarity." *See New York Times Co. v. Sullivan*, 376 U.S. at 285–286, 84 S.Ct. at 729, 11 L.Ed.2d at 710.

While not conclusive, plaintiff stated in his deposition that the *Times* had no "malice or ill will toward" him. He also testified that he did not feel that Jimmy Simms, who wrote the article, "meant to do me harm...."

The evidence is that the *Times* had nothing to do with the petition other than publishing it as a paid advertisement. It is uncontradicted that neither the publisher nor Simms had any knowledge of any false statements in the petition. The *Times* simply accepted and published the petition for a fee. To prepare for the accompanying news story on a matter of interest to the citizens of Lincoln County, Mr. Simms contacted Thompson, who informed him that she and the signors of the petition simply wanted to support Judge Mansfield.

Nothing in the news article adopts the statements in the petition as the newspaper's own. In fact, the news article identifies the petition as an advertisement.

In preparing the news article, Mr. Simms contacted plaintiff because plaintiff had been in the forefront of the controversy with Judge Mansfield and had been quoted in this regard in two previous editions of the paper. Plaintiff finds no fault with the newspaper article itself and admits that the quotes attributed to him are correct.

It is his insistence that the petition is inaccurate and that the *Times* was negligent in its failure to check the accuracy of the petition.

> Negligent failure to check the accuracy of statements in an advertisement and to discover misstatements therein, "is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." Otherwise stated, investigatory failures alone are insufficient to show recklessness on the part of a newspaper.

*Baldine v. Sharon Herald Co.*, 391 F.2d 703, 706 (3rd Cir.1968) (citation omitted).

These cases are clear that reckless conduct is not measured by whether a rea-

sonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). This same standard has been adopted by this Court in *Taylor v. Nashville Banner Publishing Co.,* 573 S.W.2d 476, 482 (Tenn.App.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979).

The affidavits and depositions of Mr. Simms and the *Times'* publisher, Elvis Gold, established a lack of recklessness. These affidavits and depositions are not controverted by facts but only by conclusions of the plaintiff.

Plaintiff relies upon a statement of Mr. Simms that he would not personally contend that any of the statements made by plaintiff or any of the group were reckless, irresponsible and slanderous. Plaintiff then attempts to transform this into the statement that the *Times* "did not even believe [the allegations] to be true themselves." A full reading of the record does not support plaintiff's argument. Mr. Simms states in his deposition that to his knowledge no one at the *Times* ever contended that plaintiff had made slanderous charges against Judge Mansfield with a total disregard for the truth.

■ It does not follow that the mere fact that a newspaper does not contend that the facts contained in an advertisement are true, means that they have reasonable doubts that they are false. The burden is upon plaintiff to show with "convincing clarity" the facts which make up the "actual malice."

■ Mrs. Thompson is entitled to the same First Amendment protection as the media defendant. *See St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and the plaintiff must likewise prove as to Mrs. Thompson by clear and convincing proof that she is guilty of "actual malice." *See Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

Mrs. Thompson was a lifelong friend of Judge Mansfield. She had gone to school with Judge Mansfield many years before he became County Judge. She testified that she had high respect for him and was a supporter of his, that there had been much publicity in the press of charges critical of Judge Mansfield and a demand that he either resign or face an ouster suit, and that she, along with others, circulated the petition and caused it to be published for the sole purpose of showing support for Judge Mansfield, and that she bore no malice or ill will toward plaintiff.

Plaintiff relies upon *Moore v. Bailey,* 628 S.W.2d 431 (Tenn.App.1981), in an attempt to show that Mrs. Thompson was guilty of "actual malice." The facts in *Moore v. Bailey* and the facts here are inapposite. In *Moore v. Bailey,* the defendant expressed doubts as to whether the published statements were true. Here, Mrs. Thompson testified that she believed the publication was true, although she did state that she did not have personal knowledge of the truth of the publication. She also admitted that the person who "made the charge" against Judge Mansfield might have felt that it was true.

However, that is not the standard. Plaintiff must show that "a false publication was made with a high degree of awareness of ... probable falsity.... There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.... Failure to investigate does not in itself establish bad faith." *St. Amant v. Thompson,* 390 U.S. at 731–733, 88 S.Ct. at 1325–1326, 20 L.Ed.2d at 267–268.

The record in this case fully supports the trial court's action in sustaining the motion for summary judgment and dismissing plaintiff's complaint. Plaintiff is clearly a public figure and he has failed to show "actual malice" on the part of either defendant.

The judgment of the trial court is affirmed and the cause remanded to the trial court for the collection of costs which are assessed against the plaintiff, and for any further necessary proceedings.

TODD, P.J. (M.S.), and CANTRELL, J., concur.