IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2012 Session

## PAMELA MURRAY v. JAMIE HOLLIN, ET AL.

**Direct Appeal from the Circuit Court for Davidson County**
**No. 10C3063      D.J. Alissandratos, Special Judge**

_____

**No. M2011-02692-COA-R3-CV - Filed December 10, 2012**

_____

This is a libelous defamation case. Appellant, a public figure, filed suit against Appellees for publication and distribution of allegedly defamatory comments. The trial court granted summary judgment in favor of Appellees upon its finding that Appellees had negated the essential element of actual malice, and that Appellant had not met her burden to provide sufficient countervailing evidence so as to survive summary judgment. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Joseph Howell Johnston, Nashville, Tennessee, for the appellant, Pamela Murray.

Mark W. Honeycutt, II and C. David Briley, Nashville, Tennessee, for the appellees, Jamie Hollin, Jan Morrison, Priscilla Eaton, Larry Eaton, and Teri Missildine.

## OPINION

On August 9, 2010, Appellant Pamela Murray filed a complaint for defamation against Jamie Hollin, Jan Morrison, Larry Eaton, Priscilla Eaton, and Terry Missildine (together, "Appellees").[1] An amended complaint was filed on or about August 13, 2010. The amended complaint states that, from 2003 to November 2009, which includes the period

_____

[1] The complaint also named Mike Peden, Andy Reuter, Sam McCulloch, Amy Bryson, Tom Hazelip, James Harney, and Brenda Ross, individually and as a member of "We the People District 5." These defendants were dismissed from the lawsuit by order of April 27, 2011. No appeal is taken as to these defendants.

of time relevant to the instant case, Ms. Murray was an elected District 5 Representative to the Metropolitan Council of Nashville and Davidson County. Mr. Hollin, an attorney by profession, is also the chief organizer of the unincorporated political association known as "We the People of District 5." At all relevant time, Ms. Morrison, Ms. Missildine, Ms. Eaton, and Mr. Eaton were active participants in the "We the People of District 5" organization. According to the complaint, in the Spring of 2009, Mr. Hollin publically criticized Ms. Murray in local print and media "for allegedly misrepresenting her residency status in. . .District 5 and her employment status as being in Tennessee." Ms. Murray avers that each of the Appellees was unhappy with her sponsorship of various zoning legislation, and that each conspired to defame her character and to organize a petition for recall election to unseat her. To this end, and beginning in August 2009, Appellees allegedly published election campaign materials that contained "false and defamatory statements impugning [Ms. Murray's] character, veracity, and integrity." According to the complaint, these "materials" included the following:

- Flyers, which were allegedly hand-delivered, door-to-door to each registered voter in District 5. The flyers stated:

  "Detroit City Limit Home of Metro Council Member"

  Our Current Council Member:

  - Lives and works in Detroit, Michigan
  - Supports out-of-town landlords instead of our neighbors
  - Misused nearly $40,000 of your tax dollars
  - Is under investigation for lying about working in Detroit since 2003

- Petition cards, stating that Ms. Murray should be removed as Council Representative "because of the dereliction of her duties and responsibilities to represent the citizens and residents of [District 5] while living and working in Detroit, Michigan." These petition cards were allegedly hand-delivered to registered voters in District 5.

- Internet postings of the foregoing statements.

The complaint goes on to state that the Appellees knew the foregoing statements were false when they were made, and that the statements "inflicted devastating harm to [Ms. Murray's] personal and professional reputation." In her complaint, Ms. Murray concedes that, for purposes of the lawsuit, she is a public figure so that actual malice must be shown to sustain her defamation case, *see* discussion *infra*. Accordingly, Ms. Murray avers that the

Appellees acted with actual malice because they "knew the statements to be false and they acted maliciously and recklessly in their lack of care and disregard for the truth and accuracy of their statements about [Ms. Murray]." Ms. Murray's libel case is brought under Tennessee Code Annotated Section 2-19-142, which provides:

> It is a Class C misdemeanor for any person to publish or distribute or cause to be published or distributed any campaign literature in opposition to any candidate in any election if such person knows that any such statement, charge, allegation, or other matter contained therein with respect to such candidate is false.

On September 13, 2010, Ms. Murray filed an amendment to the amended complaint as to Mr. Hollins only.[2] This amendment incorporates the allegations contained in the amended complaint and goes on to state that, on or after September 15, 2009, Mr. Hollin published the following "false and/or misleading statements" about Ms. Murray on the "We the People of District 5" website:

> We find it entirely unacceptable for our representative [Pamela Murray] on the most important lawmaking body in Nashville—the Metro Council—to spend a majority of their [sic] time away from us, to fail to respond to over 7,000 email inquiries from constituents, to receive thousands upon thousands of dollars in grants from Metro for the community and have to return the money for lack of use.

In addition, the amendment to the amended complaint states that, on September 18, 2009, at a public press conference that was held after a meeting of the Davidson County Election Commission, Mr. Hollin appeared on camera, where he stated: "Council Lady

---

[2] Ms. Murray's pleadings are titled: (1) "Complaint for Defamation of Character" (filed on August 9, 2010); (2) "Amended Complaint for Defamation of Character (filed August 12, 2010;" and (3) "Second Amended Complaint as to Defendant Jamie Hollin (filed September 13, 2010). As noted, the "Second Amended Complaint" as to Mr. Hollin specifically incorporates all of the allegations and averments as set out in the "Amended Complaint." It is clear from the content of the so-called "Second Amended Complaint," that it is, in fact, an amendment to the "Amended Complaint." By way of edification, an "amended" complaint and an "amendment to" a complaint are two different things. An "amended complaint" is complete in itself without adoption or reference to original; as such, it supersedes and destroys the original complaint as a pleading. *McBurney v. Aldrich*, 816 S.W.2d 30 (Tenn. Ct. App. 1991). An "amendment" to a complaint merely modifies the existing complaint, which remains before the trial court as modified. *Id.*

Murray owes $76,000.00 to the City and Mayor Karl Dean wants to know where the money is." Ms. Murray claims that Mr. Hollin made both the website statement, and the on-camera statement, with knowledge that the statements were untrue, and with actual malice. By her complaint, and amendments thereto, Ms. Murray sought $500,000.00 in compensatory damages, and $500,000.00 in punitive damages.

Although each Appellee filed separate answers (except Mr. and Mrs. Eaton, who filed a joint answer), all denied the material allegations made in the amended complaint, and amendments thereto, and each raised, as an affirmative defense, the truth of the allegedly defamatory statements.[3] On October 1, 2010, the Eatons filed a motion for summary judgment, alleging, in relevant part, that Ms. Murray had failed to present clear and convincing evidence of actual malice. On October 15, 2010, Ms. Morrison filed a motion for summary judgment, also alleging that Ms. Murray had failed to meet her burden to show actual malice. On May 3, 2011, Ms. Missildine also filed a motion for summary judgment, wherein she, too, asserts that Ms. Murray has not shown actual malice. And, on May 4, 2011, Mr. Hollin filed a motion for summary judgment, claiming that the allegedly defamatory statements were opinion rather than fact, and thus not actionable. In the alternative, Mr. Hollin asserted that, to the extent the statements at issue were statements of fact, the undisputed evidence shows that these statements were true. Finally, Mr. Hollin avers that, even if the statements were not true, Ms. Murray cannot show actual malice. Ms. Murray opposed all of the motions for summary judgment.

Following discovery, Ms. Murray filed a motion for voluntary dismissal, without prejudice, as to the Eatons and Ms. Morrison. Therein, she states that:

> After completion of all. . .depositions and review of the e-mails that have been produced by [these Appellees], [Ms.Murray] has obtained proof of falsity as to some of the statements in question, and publication and malice on the part of most, if not all [Appellees]. [Ms. Murray] has developed circumstantial evidence of actual malice but not enough to meet the burden of proof by clear and convincing evidence as to these [Appellees].

---

[3] Concurrent with his answer, Mr. Hollin also filed a counter-complaint against Ms. Murray, alleging that he and Ms. Murray had each engaged in a contested election campaign from September 21, 2009 to November 12, 2009 for the District 5 Metro Council Representative position. During that campaign, Mr. Hollin alleged that Ms. Murray had defamed him in various ways. Mr. Hollin's counter-complaint was dismissed upon grant of summary judgment in this case. In its November 1, 2011 order, the trial court notes that Mr. Hollin "concedes that his claims were brought 'in the alternative,'" meaning that, if Ms. Murray's defamation claims were allowed, then her statements against Mr. Hollin would also constitute defamation. Mr. Hollin does not appeal the dismissal of his counter-complaint.

The Eatons and Ms. Morrison opposed the voluntary dismissal if it was to be had without prejudice. Because the motions for summary judgment, *supra*, were pending, , Tenn. R. Civ. P. 41.01(1), the trial court gave Ms. Murray the option to dismiss her claims against the Eatons and Ms. Morrison with prejudice, or to proceed with the hearing on the motions for summary judgment.[4] Ms. Murray chose to proceed with the hearing.

Following that hearing, on August 8, 2011, Judge James G. Martin, III entered an order, denying Appellees' motions for summary judgment.[5] Relying upon ***Hannan v. Alltel***, 270 S.W.3d 1 (Tenn. 2007), Judge Martin ruled that Appellees had not affirmatively negated the essential element of actual malice, and that Ms. Murray could still have an opportunity to prove actual malice by clear and convincing evidence at trial. On September 1, 2011, Mr. Hollin filed a motion to alter or amend the August 8, 2011 order, arguing that Judge Martin had erroneously interpreted ***Hannan***. On September 7, 2011, by order of the Tennessee Supreme Court, Judge Martin was replaced by Special Judge D. J. Alissandratos. Thereafter, on September 9, 2011, the Eatons, Ms. Morrison, and Ms. Missildine filed a joint motion for leave to join Mr. Hollin's motion to alter or amend. Sitting by interchange, Judge Martin denied the motion to alter or amend by order of September 20, 2011. On October 5, 2011, having consulted regarding the status of the case, Judge Alissandratos and Judge Martin entered an order, setting aside the order entered on September 20, 2011, which had denied Appellees' motion to alter or amend. The motion to alter or amend was set for hearing on October 21, 2011. On November 1, 2011, Judge Alissandratos entered an order, granting Appellees' motion to alter or amend, and dismissed all claims. Specifically, the November 1, 2011 order provides:

> 2. This is a case involving the First Amendment right of expression, and more particularly, political expression. Plaintiff Murray was an elected official at the time of the statements and actions of the defendants at issue. The historical context in which the First Amendment was crafted makes clear that central to its purpose was the protection of political expression, regardless of whether that expression is for or against the government, the individual representatives in government, or

---

[4] Tennessee Rule of Civil Procedure 41.01(1) allows a plaintiff to enter a voluntary dismissal "except when a motion for summary judgment made by an adverse party is pending," which was the case here.

[5] The case was assigned to The Honorable James G. Martin, III, sitting as a special judge, because of concerns over the appearance of a conflict of interest among the Davidson County Circuit Judges. The administrative budgets of the Davidson County Circuit Judges are subject to approval by the Metropolitan Council. Because Mr. Hollin is a representative for District 5, Judge Martin was assigned to the case.

candidates for government office. The First Amendment jurisprudence establishes that, among other essential elements that a plaintiff must prove, Plaintiff Murray must establish by clear and convincing evidence that the statements of the defendants are false, and that the defendants knew they were false or recklessly disregarded their falsity. . . .

\* \* \*

[4.] The defendants have submitted evidence of their genuine, good-faith belief that their statements were true. Plaintiff Murray has failed to offer countervailing evidence to create a genuine issue of material fact that must be resolved by a jury. This Court is not weighing evidence in this ruling. Rather, when faced with a motion for summary judgment, a non-moving party must come forward with evidence from which a reasonable finder of fact could rule in her favor. Plaintiff Murray has not done so. The Court finds that the defendants' evidence is not materially in dispute from the record and negates an essential element of Plaintiff Murray's case to such a degree that she cannot prove her case.

[5.] This Court does not rule in derogation of *Hannan*. . . .[T]his ruling flows from the language of *Hannan* itself. This Court does not impose a summary judgment standard by which a movant may be entitled to summary judgment by merely asserting that the non-movant cannot prove an essential element of her claim. . . . Rather, this case falls within those cases identified in *Hannan* in which the moving party offers evidence to affirmatively negate an essential element of the non-moving party's claim, which then triggers an obligation on the part of the non-moving party to come forward with countervailing evidence at that time. However, should this Court's ruling be interpreted as being in derogation of *Hannan*, this Court is comforted with the knowledge that under the Supremacy Clause, the United States Constitution takes precedence over any procedural construction that a state may create in the form of its rule. The Tennessee Rules of Civil Procedure are procedural, not substantive law. Moreover, even if they were substantive, they would be subject to the First Amendment of the U.S.

-6-

Constitution, as interpreted by the United States Supreme Court. In any event, this Court does not believe it is necessary to rule in a manner that is in conflict with *Hannan*.

Ms. Murray appeals. She raises three issues for review, as stated in her brief:

1. Whether, under the *Hannan v. Alltel* standard, proof of actual malice by clear and convincing evidence is required to defeat a motion for summary judgment on a defamation claim by a public figure.

2. Whether, under the *Hannan v. Alltel* standard, proof of disputed issues of material fact as to actual malice is sufficient to defeat summary judgment in a defamation claim by a public figure.

3. Whether, under the Supremacy Clause, the First Amendment to the U.S. Constitution takes precedence over any procedural construction that Tennessee may create in the form of its rules of civil procedure so as to deprive a public figure of due process.[6]

---

[6] As a point of practice, we note that Tennessee Rule of Appellate Procedure 24(a) provides, in relevant part, that:

> The following papers filed in the trial court are excluded from the record: (1) subpoenas or summonses for any witness or for any defendant when there is an appearance for such defendant; (2) all papers relating to discovery, including depositions, interrogatories and answers thereto, reports of physical or mental examinations, requests to admit, and all notices, motions or orders relating thereto; (3) any list from which jurors are selected; and (4) trial briefs; and (5) minutes of opening and closing of court. Any paper relating to discovery and offered in evidence for any purpose shall be clearly identified and treated as an exhibit. **No paper need be included in the record more than once.**

*Id*. (Emphasis added). This record contains several volumes, comprising 1272 pages of technical record, not counting the depositions, which are included in unedited form so as to comprise an additional four volumes of record. The length of this record is, in large part, due to the same papers being filed numerous times, the inclusion of extraneous discovery materials, and irrelevant portions of the deposition transcripts being included in our record—all of which is in direct contravention of the foregoing Rule of Appellate Procedure. The problem with inclusion of extraneous filings that are clearly excluded from the appellate record is that

(continued...)

Because this case was adjudicated by summary judgment, we first note that a trial court's decision on a motion for summary judgment presents a question of law. Our review is, therefore, *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn.1997). "This Court must make a fresh determination that the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied." ***Mathews Partners, L.L.C. v. Lemme***, No. M2008–01036–COA–R3–CV, 2009 WL 3172134, at *3 (Tenn. Ct. App.2009) (citing ***Hunter v. Brown***, 955 S.W.2d 49, 50–51 (Tenn.1997)).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." ***Id***. at 8. If the moving party's motion is properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." ***Id***. at 5 (citing ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn.1993)). The non-moving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

When reviewing the evidence, we must determine whether factual disputes exist. In evaluating the trial court's decision, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. ***Stovall v. Clarke***, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." ***Mathews***

[6](...continued)

it places upon this Court a duty that falls to the Appellant—to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should adhere to the mandates contained in Tennessee Rule of Appellate Procedure 24(a). This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

*Partners*, 2009 WL 3172134, at *3 (citing *Byrd*, 847 S.W.2d at 214). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." *Id*. "Summary [j]udgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Landry v. South Cumberland Amoco, et al.*, No. E2009–01354–COA–R3–CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn.1995)).

In *Lewis v. News Channel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007), this Court specifically addressed the issue of summary judgment in defamation and false light cases where actual malice applies:

> Summary judgments are particularly well-suited for false light and libel claims because the determination concerning whether the plaintiff is a public figure is a question of law, *see Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162, 166 (Tenn. 1992); *McDowell v. Moore*, 863 S.W.2d 418, 420 (Tenn. Ct. App. 1992), as is the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice. *Flatt v. Tenn. Secondary Schs. Athletic Ass'n*, No. M2001-01817-COA-R3-CV, 2003 WL 61251, at *3 (Tenn. Ct. App. Jan. 9, 2003); *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997); *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74 (Tenn. Ct. App. 1986) . . .
>
> Accordingly, where the actual malice standard applies, the "burden is upon plaintiff to show with 'convincing clarity' the facts which make up the 'actual malice.'" *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d at 75. Thus, "a public figure cannot resist a . . . motion for summary judgment under Tenn. R. Civ. P. 56 by arguing that there is an issue for the jury as to malice unless he [or she] makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred." *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d at 74. When reviewing a grant of summary judgment to a defendant in such a case, we must "determine, not whether there is material evidence in the record supporting [the plaintiff's case], but whether or not the record discloses clear and convincing evidence upon which a trier of fact could find actual malice."

-9-

> *Piper v. Mize*, No. M2002–00626–COA–R3–CV, 2003 WL
> 21338696, at *7 (Tenn. Ct. App. June 10, 2003) (No Tenn. R.
> App. P. 11 application filed).

*Lewis*, 238 S.W.3d at 283. Accordingly, in reviewing the trial court's grant of summary judgment to Appellees, we must determine "whether reasonable minds must agree that malice, as defined in the context of libel suits against public figures, has not been proven by clear and convincing evidence." *Hibdon*, 195 S.W.3d at 63 (citing *McCluen v. Roane County Times, Inc.*, 936 S.W.2d 936, 939 (Tenn. Ct. App. 1996)).[7] Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

To establish a prima facie case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing *Sullivan v. Baptist Mem 'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (relying on Restatement (Second) of Torts § 580 B (1977))). In *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001), the Tennessee Supreme Court expressly recognized the tort of false light invasion of privacy as set forth in Section 652E

---

[7] The summary judgment analysis applicable when *Lewis* and *Hibdon* were decided was clarified in the Tennessee Supreme Court opinions in *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76 (Tenn.2008) and *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn.2008). We have reviewed those opinions in our resolution of the instant case and do not consider that the holdings in either case abrogate the holding of *Lewis* as to what the plaintiff must show in responding to a motion for summary judgment and of *Hibdon* as to the role of this Court in reviewing the grant of summary judgment. Instead, we conclude that the *Hannan* Court's abrogation of the "put up or shut up" standard clarifies the procedure in *Lewis* so that the non-moving party's burden to produce "clear and convincing evidence upon which a trier of fact could find actual malice," *Lewis*, 238 S.W.3d at 238, is only triggered after the element of actual malice has been affirmatively negated by the moving party. *See Hannan*, 270 S.W.3d at 8 (" It is not enough for the moving party to challenge the nonmoving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial."); *Mills v. CSX Transp. Inc.*, No. E2006-01933-COA-R3-CV, 2007 WL 2262052, at *6 (Tenn. Ct. App. Aug. 8, 2007) (no perm. app. filed) ("[A] defendant seeking summary judgment must actually negate an essential element of the plaintiff's claim . . . before the plaintiff's burden to produce evidence establishing the existence of a genuine issue of material fact is triggered.").

of the Restatement (Second) of Torts.[8]

The *Hibdon* Court adopted the standard set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)), stating that, where the plaintiff in a defamation case is a public official or public figure, he or she must also prove that the libelous statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Hibdon*, 195 S.W.3d at 58 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Likewise, the Court in *West* held that the standard at Section 652E(b), which mirrors the actual malice standard employed in *Hibdon* and *New York Times Co. v. Sullivan* for defamation cases, applies in false light invasion of privacy claims where the plaintiff is a public official or public figure, or when the claim is brought by a plaintiff, who is a private individual, concerning a matter of public concern. *West*, 53 S.W.3d at 647. In this case, Ms. Murray concedes that she is a public figure for purposes of her defamation case; consequently, our focus is on whether "the record discloses clear and convincing evidence upon which a trier of fact could find actual malice." *Piper v. Mize*, No. M2002-00626-COA-R3-CV, 2003 WL 21338696, at *7 (Tenn. Ct. App. June 10, 2003).

Turning to the complaint, as set out above, Ms. Murray avers that the Flyer and campaign literature that were distributed by Appellees defames her. Specifically, Ms. Murray asserts that the following statements were false, and that Appellees, jointly or severally, knew that they were false at the time they were made: (1) that Ms. Murray had failed to respond to over 7,500 emails; (2) that Ms. Murray lives and works in Detroit; (3) that Ms. Murray supports out-of-town landlords instead of Nashville residents; (4) that Ms. Murray misused tax and/or grant monies; (5) that Ms. Murray is under investigation for ethics violations. Although Ms. Murray's burden at trial to show actual malice is by clear and convincing proof, under Tennessee Rule of Civil Procedure 9.02, at the pleadings stage, "malice may be averred generally." So, Ms. Murray's averment that the foregoing

---

[8] The definition of the tort from Section 652E of the Restatement (Second) of Torts is as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

statements were made with knowledge that they were false and with actual malice is sufficient at the outset.

Turning to the summary judgment, in support of their motions, the Appellees filed depositions, along with myriad documentation, all of which this Court has carefully reviewed. As is relevant to each of the averments above, Appellees' evidence in support of their motions for summary judgment shows:

## A. *Unanswered emails*

In his affidavit, filed in support of the motion for summary judgment, Mr. Hollin states that:

> Based upon a Public Records Requests for Ms. Murray's Outlook email information, I obtained Ms. Murray's Outlook information, which reflected 7,580 unopened emails. [Mr. Hollin attaches Exhibit 14 to his affidavit, which shows three "screenshots reflecting the [unopened] emails."]. Scrolling down through them, I recognized many of [the] neighbors I knew in the 5[th] District. Because it is a "live" document, when an email is clicked on[,] the number of unopened emails goes down, which is why the screenshot shows 7,577. The snapshop also shows that weeks would go by without her sending an email.

## B. *Lives and Works in Detroit*

Exhibit 1 to Mr. Hollin's affidavit is a copy of an April 27, 2009 NewsChannel 5 investigative report concerning Ms. Murray. The title of the story, as reported by Phil Williams, is *Council Member Spends Days, Nights in Detroit*. The article states that Ms. Murray does not spend her days in her district, but spends them 539 miles away in Detroit. It goes on to state that Ms. Murray works for the Sunshine Treatment Institute, a methadone clinic located in Detroit, where she is the admissions coordinator, with Monday through Friday hours of 6:00 a.m. to 6:00 p.m. Mr. Williams' article indicates that, when he called the Sunshine Treatment Institute in Detroit, the receptionist said that Ms. Murray was there, but she refused to talk with him. The article further states that Ms. Murray lists a Michigan address on credit applications, and "among social worker regulators."

Exhibit 2 to Mr. Hollin's affidavit is a follow-up story, in which Ms. Murray "defended" herself by stating that she did not spend more than 60% of her time in Detroit.

According to his affidavit, Mr. Hollin based his belief that Ms. Murray does not live in Nashville on these news reports. In addition, Mr. Hollin cites his own research. According to the affidavit, Mr. Hollin performed several internet searches that revealed the following: (1) A State of Michigan Social Worker license, verifying that Ms. Murray worked in Detroit; (2) A Lexis-Nexis public records search on Pam Murray revealing that one of her residences is in Detroit, and that Ms. Murray is the owner of that property; (3) The Sunshine Treatment Institute website indicating that Ms. Murray holds the positions of Program Director and Admissions Coordinator, working 60 hours per week at the Detroit facility. Mr. Hollin provided documentation in the form of print-outs of the various websites.

In her deposition testimony, Ms. Missildine states that she made frequent calls to Ms. Murray's office in Nashville and was unable to reach her. Ms. Missildine stated that it "made sense that she wasn't in Nashville."

### C. *Support of Out of Town Landlords*

This allegation arises from Ms. Murray's support of a zoning ordinance, benefitting landlords Sheridath N. Blackwood and Charles R. "Friday" Blackwood, who are from Madison, Tennessee. Mr. Hollin provided evidence that Ms. Murray had, in fact, supported the zoning variance that the Blackwoods requested in order to permit them to subdivide the property at 837 Cleveland Street, in Nashville, into a "quad plex."

### D. *Misuse of Tax and/or Grant Monies*

The statements concerning alleged misuse of these funds involves a grant by Metro Nashville to Ms. Murray's organization, North Edgefield Organized Neighborhoods ("NEON"). In his affidavit, Mr. Hollin states that:

> I, like many others in District 5, saw Pam Murray as synonymous with NEON, because she touted herself as having formed and run it, as having procured money for it from Metro, had apparently been an officer and regularly used its facilities for other types of meetings she wished to conduct, when she was in town.

Exhibit 10 to Mr. Hollin's affidavit is a portion of the NEON website, which touts Ms. Murray's involvement with certain NEON projects. The website further indicates that Ms. Murray has been involved with NEON from its 1981 inception; that she has procured funding for the organization. Mr. Hollin's affidavit goes on to state that:

-13-

Pam Murray took credit for procuring Metro money for NEON, and I believe that any procurement to an organization as irresponsible as NEON is a misuse of taxpayer dollars.

Exhibit 11 to the affidavit is an Office of Financial Accountability ("OFA") "Monitoring Report" of Neon. Exhibit 12 is a letter from OFA, reflecting NEON's failure to use $76,000 of the Metro Money given to it. Based upon these exhibits, Mr. Hollin states that:

Pam Murray helped procure hundreds of thousands of dollars to NEON over the years. . . . I, along with other citizens, attempted to communicate with OFA about NEON's numbers, but once OFA became aware that these citizens were scrutinizing how poorly it had overseen NEON's sloppy use of money, OFA began to stonewall, frustrating my attempts to get clarification and updates on the NEON financial issue. Because I believe [Ms. Murray] is intrinsically involved in NEON, I see her as culpable in NEON's failure to properly use the money.

Mr. Hollin also attaches Exhibit 13 to his affidavit, which is a NEON expense report, allegedly showing "how little of NEON's money actually went to programs." Mr. Hollin states that subsequent reports, specifically the 2008 report, included a line-item for $20,559.85 for "Occupancy," which OFA identified as typically including rent and utilities. Because NEON allegedly enjoyed free rent, Mr. Hollin cites this line-item as proof of misappropriation. Mr. Hollin further notes the OFA "Monitoring Report," which found that NEON did not have necessary accounting resources or an accounting system to track grant funds. Moreover, the report indicates: (1) that NEON did not have documentation to support expenditures reported to Metro; (2) that NEON had failed to comply with a requirement to submit program outcome reports; (3) that it was unable to provide necessary financial reports so as to allow the OFA to confirm whether grant funds were used in the manner reported; (4) that NEON over reported its expenses, and failed to maintain adequate documentation on grant-related expenses, which made it impossible for OFA to "determine if the expenditures charged to the grant were reasonable, necessary, and allowable." According to the report, NEON failed to use all of the grant money in the community per the grant agreement. Accordingly, OFA demanded the unused monies to be returned.

E. *Investigation for Ethics Violations*

On May 6, 2009, Terry Dale Vibbert filed a complaint with the Tennessee Ethics Commission ("TEC"), asserting that Ms. Murray had made false statements on her disclosure

-14-

of interest forms for 2008 and 2009. Copies of the complaint are included as addenda to Mr. Hollin's affidavit. Therein, Mr. Vibbert asserts that, when required to disclose all sources of income, Ms. Murray falsely stated only "self-employed," and did not mention her employment at Sunshine Treatment Institute.

A separate ethics complaint was later filed by Ms. Missildine. The second complaint alleged that Ms. Murray used public property (i.e., copy machines and paper) for personal campaign use. Ms. Missildine's allegations were based upon events that occurred on Saturday, August 15, 2009. That was the kick-off day for the recall petition drive, *supra*. Ms. Missildine alleges that, when Ms. Murray discovered the recall canvassers were going door-to-door in the district, Ms. Murray went to the Metro Nashville Courthouse, where she used the copy machine and Metro paper to print her own flyers, which she then proceeded to put on the doors previously visited by recall canvassers. According to the complaint, Ms. Murray was tracked by police going to the courthouse. The Metro Courthouse security logs for August 15, 2009, which are in the record, reflect that Ms. Murray entered the courthouse at 11:22 a.m., and entered the Metro Council mailroom (where the copy machines are located) at 11.24 a.m. Mr. Hollin, upon discovering these facts, stated that they formed his good-faith belief that Ms. Murray had misappropriated public resources for her private campaign.

As set out immediately above, the affidavits and materials filed in support of the motions for summary judgment indicate that the allegations were based on actual documentation. Because the allegations were supported by documentation, tending to affirm the truth of the assertions, Appellees successfully negated the element of actual malice that was essential to Ms. Murray's claims, thereby shifting the burden to Ms. Murray to produce evidence of specific facts establishing genuine issues of material fact on that issue. ***Martin v. Norfolk Southern Railway Co.***, 271 S.W.3d 76, 84 (Tenn.2008). Ms. Murray could satisfy her burden by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06. ***Id***. (citing ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn.1998); *accord* ***Byrd v. Hall***, 847 S.W.2d 208, 215 n.6 (Tenn.1993)).

In response to materials filed in support of the motions, Ms. Murray filed her deposition. The question, then, is whether the answers proffered therein are sufficient to satisfy Ms. Murray's burden to establish a genuine issue of material fact under ***Martin***.

A. *Unanswered emails*

In her deposition testimony, Ms. Murray explains the unanswered emails as follows:

Q. Now, if you look down at the inbox. . .there is [sic] over 7,500 unopened e-mails. . . . Do you see that?

A. Right.

Q. Do you understand those are e-mails that have not been opened?

A. It couldn't been from the whole council term. . . . And let me tell you, let me explain why. . . . Of those e-mails, there is [sic] less than 100 from our constituents. . . .

\*                               \*                               \*

Q. Okay. So I understand your point to be that not all of the. . .7500 or more unopened e-mails were from constituents. Is that the thing about that statement that you feel makes it false and defamatory.

A. No. What marks it false and defamatory is the misrepresentation to the public that I do not respond to my constituent concerns.

Q. Well, there are two different comments, one is a more general comment that you don't respond to your constituents , but then, there was a specific comment that you've identified as defamatory, as well, that you had 7000 unopened e-mails from constituents, right?

A. Right.

Q. So, with regard to the second of those two, that there were 7000 unopened e-mails from constituents, is your complaint about that statement the fact that it says constituents when, in fact, they're not actually all constituents; is that what makes it false and defamatory?

A. Right.

-16-

## B. *Lives and Works in Detroit*

When asked to explain the contents of the Sunshine Treatment Institute website in her deposition, Ms. Murray did not specifically deny that she works there. Rather, she indicated generally that the site contained "misinformation." She did not elaborate on what website content was specifically incorrect. When asked whether a reasonable person could have looked at the website and believed that she worked and lived in Detroit, Ms. Murray conceded: "Sure." Ms. Murray provided no other evidence to negate the proof offered by Mr. Hollin concerning the fact that she owned property in Detroit, or that she used that address for work and credit information.

## C. *Support of Out of Town Landlords*

In her deposition, Ms. Murray testified concerning her support of the zoning variance in favor of the Blackwoods. First, she attempts to state that, because Madison (where the Blackwoods reside) and Nashville are both in Davidson County, Madison is not "out of town;" however, eventually Ms. Murray admits that they are two different cities. Concerning her support of the zoning variance, Ms. Murray states:

> Q. Did he [Blackwood] seek a zoning variance to permit him to subdivide the property. . .into a quad plex?
>
> A. Yes.
>
> Q. Did his request take the form of Ordinance No. BL 2009 429?
>
> A. Yes.
>
> \*                    \*                    \*
>
> Q. And you supported Mr. Blackwood in that effort?
>
> A. No.
>
> Q. No, you did not?
>
> A. No.

Q. Did you not speak on behalf of Ordinance No. BL 2009 429 at repeated Metro Council hearings?

A. Yes. I supported the neighbors of the Greenwood Neighborhood Association.

Q. Did you support the ordinance?

A. I supported the Ordinance after I supported the neighbors of the Greenwood Neighborhood Association.

Q. Okay. Let's be very clear about this. Did you support Ordinance No. BL 2009 429, which sought to change. . .the zoning [on the Blackwood property]?

A. Yes.

No further evidence was proffered to refute the allegation that Ms. Murray supported the Blackwoods, who were out-of-town landlords.

D. *Misuse of Tax and/or Grant Monies*

In her deposition, Ms. Murray attempts to distance herself from NEON, stating:

My relationship with NEON. I was more like an advisor to try to help them. I didn't, didn't really originally organize NEON. I did organize community meetings back in the early '80s. I was having a lot of meetings at Cleveland Park because I was trying to clean up the neighborhood. I been [sic] trying to clean up that neighborhood ever [sic] since I got there. . . . But as far as like on the board, I was more, I was on the board as more I guess as an advisor. But as far as a voting member or anything like that, I couldn't be a part of that because, you know, I am a city council member. . . .

Later in her testimony, Ms. Murray admits that, "[s]ince January of 2010 or somewhere along in that area, [NEON] asked me to become vice-president and I accepted that. So I have been with them since January of last year or somewhere along in that line to try to help get things back on track. It is a lot of volunteer work. . . ."

Concerning the alleged misappropriation of grant funds by NEON, Ms. Murray testified:

> Q. Okay. You advocated for money to go to NEON when you were on the council, right?
>
> A. Yes.
>
> Q. Okay. And you believed that that was a good use of that money, didn't you?
>
> A. Yes.
>
> Q. Okay. Others could have believed that it was a misuse of that money, couldn't they?
>
> A. Yes.

E. *Investigation for Ethics Violations*

In her deposition testimony, Ms. Murray admits that Mr. Vibbert did, in fact, file an ethics complaint against her:

> Q. And you were the subject of that investigation [i.e., instigated by Mr. Vibberts with the TEC], correct?
>
> A. I would say that my, my self-employment income was the, was the question of investigation for, I think Mr. Vibbert was asking did I report all of my income.
>
> Q. Right. So, you were the subject of that investigation, correct?
>
> A. Right.

Concerning the ethics investigations, which was instigated by Ms. Missildine, Ms. Murray states:

> Q. That morning, that Saturday, August 15, when you first saw those [recall flyers] on the doors, did you go to the Metro

Council Office for anything?

A. No, no.

Q. You made no visit whatsoever to the Metro office?

A. No.

Q. Okay. Are you aware that, when they were canvassing that morning, that they had undercover police officers on both Jamie Hollin and you?

A. Yes. I mean, I saw all the police officers there.

Q. Did you know that one was assigned to you. . .at all times?

A. One was not assigned to me, no.

A. Huh?

*                                    *                          *

Q. Okay. I might have said this in a way that you could have misunderstood. I don't mean to say you knew there was [an officer with you]. I mean, a plain clothed police officer watching you without your knowledge, have you ever since then learned that or know that or heard that?

A. No.

Q. Okay. And so, if they traced you to the Metro Council Office that morning, does that change your testimony about whether you went to the Metro Council office?

A. Let me say this. I don't remember going there. . . . If they say I was there, I was there. . . .

Q. Well, isn't it true you left the council office with a stack of fliers [sic] that you then proceeded to put on the doors?

-20-

A.  I don't know.  I don't know. . . .  I made my fliers [sic] at Kinko's on West End.

Although she continued to deny that the flyers she put on doors were made with Metro resources, Ms. Murray provided no receipt or other documentation to indicate that the flyers were, in fact, made at Kinko's.

We have reviewed the entire record in this case and conclude that, from the evidence provided in opposition to the motions for summary judgment, Ms. Murray did not meet her burden under *Martin*, *supra*.  As noted above, when she made her motion for voluntary dismissal without prejudice, Ms. Murray conceded that she could not, at that time, meet her burden of proof as to the Eatons and Ms. Morrison.  Even after further time for discovery, from our review, Ms. Murray has failed to: (1) point to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitate the evidence attacked by the moving party; or (3) produce additional evidence establishing the existence of a genuine issue for trial.  *Martin,* 271 S.W.3d at 84.  Based upon the foregoing deposition responses, and lack of supporting evidence, we also conclude that Ms. Murray has failed to provide sufficient countervailing evidence to meet her burden to rebut the factual allegations offered by Mr. Hollin and Ms. Missildine in support of their motions for summary judgment.

Ms. Murray also raises an issue concerning application of the Supremacy Clause in this case.  From the trial court's order, *supra*, it did not, in fact, rely upon the Supremacy Clause in reaching its conclusion that summary judgment in favor of Appellees was required.  Rather, the court clearly states that it applied the mandates of *Hannan* in reaching its conclusion that Ms. Murray had failed to meet her burden to provide countervailing evidence showing actual malice.  Having determined above that the trial court correctly orchestrated the *Hannan* burden-shifting analysis in reaching its decision on summary judgment, we need not discuss the applicability of the Supremacy Clause.  Accordingly, Ms. Murray's third issue is pretermited.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion.  Costs of this appeal are assessed against the Appellant, Pamela Murray, and her surety.

_____
J. STEVEN STAFFORD, JUDGE

-21-